**Gerald S. SLAUGHTER,
et al., Plaintiffs,**

**Roma S. Bates, et al., Plaintiffs–
Appellants,**

v.

**SOUTHERN TALC COMPANY, et
al., Defendants–Appellees.**

**No. 90–8701.**

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1991.

Daniel W. Andrews, Mike Davis, Byrd, Davis & Eisenberg, Austin, Tex., for plaintiffs-appellants.

John W. Grund, Ernest E. Staggs, Jr., Tilly & Graves, Denver, Colo., for Owens–Corning Fiberglas Corp.

J. Frank Kinsel, Cantey & Hanger, Ft. Worth, Tex., for Southern Talc.

Frank M. Bean, Rick Thamm, Bean & Manning, Houston, Tex., for Eagle–Picher Industries, Inc.

*ter v. Southern Talc Co.*, 919 F.2d 304, 308 (5th Cir.1990).

Before POLITZ and HIGGINBOTHAM, Circuit Judges, and PRADO,[1] District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Seventeen plaintiff-appellants are employees, former employees, or relatives of employees at the General Tire plant in Waco, Texas. They appeal a summary judgment granted to Southern Talc Co. and Owens–Corning Fiberglass.[2] The district court denied substitution on the death of two plaintiffs, and that ruling is also before us.

The district court concluded that there was no jury question regarding plaintiffs' exposure to defendants' products. We disagree. We reverse the summary judgment in favor of OCF; however, we affirm the summary judgment granted to STC.

We also vacate the district court's order refusing to substitute Mrs. Moran and Mrs. Green, as individual plaintiffs for their deceased spouses. We reinstate the district court's earlier order granting their motion to substitute themselves individually and for the benefit of their children for their deceased spouses.

## I.

This suit was filed on March 19, 1987 by 451 employees and former employees of the General Tire and Rubber Company against 13 producers and users of asbestos-containing products. The suit alleges that defendants' products caused pulmonary disease. After two years of discovery, defendants moved for partial summary judgment, on the grounds that 421 plaintiffs had suffered no pulmonary disease. The district court granted partial summary judgment in favor of defendants, and this court upheld the order on appeal. *Slaugh-*

After the remaining parties had completed discovery, the district court granted summary judgment in favor of defendants. The district court found that plaintiffs failed to raise a fact question of producing cause, explaining that the plaintiff's evidence showed:

> at best, only [that] ... the Defendants' products, as well as the same types of products of several other manufacturers and suppliers, were used at the plant; that "dust" was created when all these types of products were used or disturbed by accident or by repair; and that, generally, those who worked in the plant were exposed to the "dust."

The district court found that plaintiffs failed to show that they were exposed to any asbestos fibers from STC and OCF products. According to the district court, "there is no direct evidence that a particular product supplied by any of the Defendants *released asbestos fibers which were inhaled by a particular Plaintiff*" (emphasis in original).

The parties do not dispute that STC's and OCF''s products were delivered to the General Tire Plant. There is evidence that Kaylo, an OCF insulation containing 15% asbestos, was delivered to or installed in the General Tire plant between 1960 and 1982. Southern Talc Co. concedes that over forty tons of its talc were actually delivered to the plant between 1981 and 1984. STC objects to plaintiffs' contentions that 120 tons of STC talc were delivered to the plant between 1964 and 1965. STC concedes, however, that "[STC] has records which indicate [that] 70 tons of ground talc ... may have been shipped in 1964 and 50 tons of ground talc ... may have been shipped in 1965." There is, therefore, evidence that over 160 tons of STC talc were delivered to the General Tire plant between 1964 and 1984.

---

1. District Judge of the Western District of Texas, sitting by designation.

2. After the district court awarded summary judgment to Eagle–Picher Co. it filed for reorganization under the Bankruptcy Code, staying all proceedings regarding it.

It does not follow, however, that the delivered talc actually contained asbestos. It is true that a study by Dr. William E. Longo, Ph.D., apparently concluded that STC's talc contains 3% asbestos. That study, however, was based on small samples from the General Tire plant some time in 1987. There is no evidence that talc containing traces of asbestos in 1987 indicates asbestos in talc delivered several years earlier. To the contrary, asbestos does not appear uniformly in talc and may not be present at all.

Plaintiffs did not identify Kaylo insulation as such. They testified that "insulation" or "insulated pipes" were near their workplaces. OCF ceased manufacturing or delivering Kaylo after 1973. Three non-party witnesses identified insulation as OCF or Kaylo insulation. Joseph Lipscomb, an employee at the General Tire plant from 1969 until 1980, testified that "OCF insulation" was delivered to the receiving department while he worked there. Jim DeWitt, an insulator and pipefitter in the plant from 1962 until 1985, testified that he installed Kaylo and other OCF insulation on pipes "all over the plant." Finally, Richard Jackson, a plant worker from 1947 until 1983, testified that Kaylo and other kinds of OCF insulation were installed throughout the plant.

DeWitt testified that insulators and pipefitters periodically removed deteriorating insulation throughout the plant. Richard Jackson testified that pipe insulation was removed and replaced throughout the plant on a daily basis and that block insulation was removed and replaced on a weekly basis. According to DeWitt, Clifford Archer, and Jackson, when the pipe insulation was removed and replaced, visible dust would cover the workers in the area. In addition, Charles Ay, a non-party witness who visited the plant testified that "there was a voluminous amount of piping, that a great deal of piping was in disarray, and that it was a very dirty place to be."

All plaintiffs testified that they worked near insulated pipes. In addition, Bates, Gibson, Munos, Pryor, and Stump recalled that insulators replaced pipe insulation near them, and Gibson, Pryor, and Stump testified that insulation dust regularly covered them when the pipe insulation was repaired near them.

## II.

The district court held that, under Texas law, plaintiffs had produced insufficient summary judgment evidence of actual exposure to defendants' products, a conclusion we review de novo. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

In a motion for summary judgment defendant-movants have the initial burden of "informing the district court of the basis for its motion and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If defendant-movants allege an absence of specific facts necessary for non-movants to establish an essential element of their case, then plaintiff-non-movants must respond by setting forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the non-movant fails to do so, then summary judgment is awarded against the non-movant.

Under Texas law, plaintiffs must prove that asbestos fibers from defendants' products were an actual, producing cause of plaintiffs' injury. *See Gaulding v. Celotex Corp.,* 772 S.W.2d 66, 68 (Tex. 1989) ("A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury").

### A.

The plaintiffs have not raised an issue of fact as to whether STC's products caused their injuries: their evidence is insufficient to support a jury's inference that

STC talc allegedly inhaled by plaintiffs contained asbestos.

The only evidence that STC's talc contained asbestos was Dr. Longo's study concluding that 3% of a sample of STC talc recovered from the General Tire plant in 1987 consisted of asbestos. There was, however, no evidence presented that STC talc contained any asbestos when it arrived at the General Tire plant years before Dr. Longo's study. Nor was there any testimony that asbestos naturally occurs in talc. Indeed, there was no evidence that the asbestos found in the 1987 sample had anything to do with its source: plaintiffs offered no explanation for the presence of trace amounts of asbestos in the talc. Plaintiff's counsel conceded at oral argument that he lacked any scientific evidence justifying an inference of asbestos in pre–1984 talc from the fact of asbestos in 1987 talc.

Plaintiffs had, in short, no evidence that STC's talc contained asbestos during the years in which plaintiffs allege that they were injured. We hold, therefore, that the district court did not err in awarding summary judgment in favor of STC.

### B.

The claims against OCF are more difficult to resolve. Defendants do not dispute that their Kaylo insulation contains 15% asbestos. They contend instead that the evidence would not support a jury's inference that plaintiffs actually inhaled fibers from OCF's product. The district court agreed and granted summary judgment to OCF. While the question is close, we conclude that plaintiffs did produce sufficient evidence of exposure to withstand summary judgment.

■ The most frequently used test for causation in asbestos cases is the "frequency-regularity-proximity" test announced in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986).[3] *Lohrmann* held that a motion for summary judgment cannot be defeated merely by alleging

work at a shipyard in which defendants' asbestos products had somewhere been present. Rather, there must be proof of frequent and regular work in an area of the shipyard in proximity to some specific item of defendants' asbestos-containing product. The *Lohrmann* court found that exposure to an asbestos-filled pipe cover on ten to fifteen occasions did not satisfy this test.

■ We agree that *Lohrmann* recites the appropriate test for a minimum showing of producing cause in asbestos cases. A plaintiff must prove that, more probably than not, he actually breathed asbestos fibers originating in defendants' products. This proof can be made by showing that plaintiff frequently and regularly worked in proximity to defendants' products such that it is likely that plaintiffs inhaled defendants' asbestos fibers.

■ Defendants contend here that plaintiffs cannot meet the proximity prong of the *Lohrmann* frequency-regularity-proximity test, because there is no evidence placing defendants' products at a specific location near plaintiffs' regular and frequent worksites in the 49–acre General Tire plant. Plaintiffs, in response, rely on a circumstantial proof of exposure. Plaintiffs argue that (1) defendants' products were actually delivered to the General Tire plant; (2) defendants' products were actually installed randomly and evenly "all over the plant"; and (3) all plaintiffs worked near places where defendants' products would have been installed (e.g., insulated pipes, talc barrels, etc.). From these three facts, they argue that it is reasonable for a jury to infer sufficient proximity for producing causation.

We believe that circumstantial proof of exposure to OCF's products is sufficient to withstand summary judgment. As we explain below, the evidence indicated a significant probability that plaintiffs worked in close proximity to OCF's Kaylo insulation,

---

**3.** Courts in every circuit but the D.C. Circuit, and the First, Second, and Fifth Circuits have adopted the Lohrmann test. In addition, Michi-gan, Massachusetts, New Jersey, Illinois, Pennsylvania, Maryland, Nebraska, and Oklahoma have adopted the test.

even though no witness testified to seeing plaintiffs work near Kaylo.

This court has inferred proximity to products from purely circumstantial evidence similar to the evidence in this case. In *Whatley v. Armstrong World Industries*, 861 F.2d 837 (5th Cir.1988), for instance, this court upheld a jury's allocation of fault for plaintiff's asbestos-related injury, even though there was no direct evidence that the plaintiff had worked with the defendants' products. Whatley, a "chipper" who worked in a shipyard smoothing hulls, brought suit against fourteen manufacturers of asbestos, claiming that their products had caused his lung cancer. After thirteen defendants either settled or became insolvent, Whatley proceeded against the remaining defendant, Raymark Industries. While finding liability, the jury reduced the damages award to Whatley by 90.01%, finding that other defendants' products had caused this share of Whatley's injuries. Whatley then appealed urging insufficient evidence of exposure to settling defendants' products.

This court found sufficient evidence that all but two of the settling defendants had contributed to plaintiff's injury. The products of one settling defendant, Celotex Corp., were connected to Whatley by the testimony of a co-worker named Cook. Cook did not testify that he had actually seen Whatley working near Celotex's asbestos-containing pipe insulation. Cook simply testified that he had seen such insulation on some ships and that he had worked near Whatley during six months out of the year. The *Whatley* court found this testimony to be sufficient circumstantial evidence of exposure.

Under *Whatley*'s logic, a reasonable jury could infer from the evidence in this case that all plaintiffs probably worked near OCF's pipe insulation. Plaintiffs' coworkers, Jackson and DeWitt, testified that OCF's Kaylo product was "all over" pipes in the General Tire plant. OCF does not dispute that all plaintiffs worked near insulated pipes. As in *Whatley*, no witness testified that he saw the plaintiff actually working near Kaylo insulation. However, testimony that Kaylo was "all over" pipes, if believed, indicated a high probability that anyone working near pipes also worked near Kaylo.

*Whatley* was not an aberration. In several other decisions, this court has held that exposure can be proven by circumstantial evidence similar to the proof offered in *Whatley*. In *Martin v. American Petrofina, Inc.*, 779 F.2d 250, 251–52 (5th Cir. 1985), *vacated in part on different grounds*, 785 F.2d 543 (1986), for instance, the pipefitter-plaintiff, Martin, could not recall the brand of mastic he used to coat pipes. We held that testimony by insulators in the Exxon plant that they use defendants' product "more frequently than any other" and that defendants' product was used "throughout the plant" sufficiently supported a finding of exposure to defendant's product under Louisiana law.

Likewise, in *Jackson v. Johns–Manville Sales Corp.*, 727 F.2d 506, 523–24 (5th Cir. 1984), *reh'g. en banc on different grounds granted*, 727 F.2d 506 (1984), *aff'd.*, 781 F.2d 394 (1986), co-workers testified that defendants' products had been used on ship hulls where plaintiff had also worked. We held that this supported defendant's liability under Mississippi law, despite the fact that plaintiff could not recall defendant's products being near him at work and despite the fact that there was no direct evidence that the plaintiff had worked in the hulls during the times that defendants' products were being used on those hulls.

The essence of plaintiffs' proof of exposure, like the theories of exposure upheld in the cases summarized above, rests on the common sense idea that, if defendants' products are *likely* to be present at a specific location within the workplace, plaintiffs are likely to have been exposed to the products if they worked near those specific locations, even without explicit testimony that the plaintiff worked near the specific product. This is an intuitively plausible theory of exposure, accepted repeatedly by this court and also by other courts. *See, e.g., Lockwood v. A.C. & S., Inc.*, 109 Wash.2d 235, 744 P.2d 605 (1987) (en banc) (where Raymark's asbestos cloth was used

in shipyard on type of jobs in which plaintiff engaged, court allows jury to infer plaintiff's exposure to Raymark's cloth, despite lack of any testimony that plaintiff ever used cloth).

Defendants argue that *Whatley* and the other Fifth Circuit cases cited by plaintiffs are inconsistent with the Texas Supreme Court's decision in *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 71 (Tex.1989). In *Gaulding,* plaintiff alleged that an asbestos board purchased at a scrap yard and used to build a cupboard was responsible for plaintiff's spouse's death from lung cancer. The Texas Supreme Court upheld an award of summary judgment for defendant-movant, on the grounds that plaintiffs had no evidence linking the scrap board to *any* producer, much less to defendants in the case.

*Gaulding* did not discuss evidence necessary to prove proximity to defendants' products. It had no occasion to do so, because plaintiffs offered no evidence, circumstantial or otherwise, that any of the defendants had, in fact, produced the abandoned scrap of asbestos. *Gaulding* simply holds that plaintiffs must prove that defendants actually produced the asbestos-containing products in question—a proposition that plaintiffs do not dispute and easily satisfy. Texas law does not contradict the relatively lenient standard of proof of causation in *Whatley.*

■ Defendants make much of the fact that OCF ceased producing or delivering Kaylo after 1973. It does not follow, however, that liability ceased on that date. The Texas Court of Appeals rejected such an argument in an asbestos case. In *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 685 (Tex.App.—Texarkana, July 16, 1991, no writ), the court stated:

The use and exposure to the Owens–Illinois product cannot logically be said to have terminated on the date that the company quit manufacturing this product. Nothing in the evidence shows how much of the Owens–Illinois product Texas Eastman may have had on hand for later use at that time. Also, much of the exposure to this type of product occurred when it was torn out and replaced. The tearing out and replacing may have been years after the installation of this product. Without these dates, the specific date that the company sold its manufacturing operation does not establish the date that the exposure to the product ended.

We conclude that the district court erred in finding that plaintiffs produced insufficient evidence to withstand summary judgment. The evidence that plaintiffs were actually exposed to OCF's products was circumstantial. The case is close, and the evidence shown by plaintiffs lies close to the minimum necessary to support a verdict of actual exposure. We cannot say, however, that no reasonable jury could conclude that plaintiffs more probably than not inhaled asbestos fibers from OCF's products.

### III.

Defendants argue that Mrs. Green's and Mrs. Moran's motion to substitute was barred under the Texas Statute of Limitations and by the doctrine of res judicata. We are not persuaded.

■ Tex.Civ.Prac. & Rem.Code § 71.-003(a) provides that an individual may sue for wrongful death "only if the individual injured would have been entitled to bring an action for the injury if he had lived." Plaintiffs in a wrongful death action are in the procedural shoes of the decedent, and defenses to the decedent's personal injury action are defenses to the wrongful death plaintiffs' claim. *Delesma v. City of Dallas,* 770 F.2d 1334, 1338 (5th Cir.1985); *Suber v. Ohio Medical Products,* 811 S.W.2d 646, 649–51 (Tex.App.—Houston 1991, writ requested 8/6/91) (where decedent had already recovered for injury, beneficiaries are precluded from bringing new wrongful death action to recover for decedent's injuries, because decedent's judgment would bar decedent from relitigating claim).

■ In this case, Mrs. Moran and Mrs. Green attempt to substitute themselves individually and for the benefit of their children for their deceased husbands, to appeal

the final judgment entered against their husbands by the district court. Res judicata would not have barred the husbands from appealing this judgment had they survived. It is, therefore, no bar here. *See* Fed.R.App.P. 4(a)(4).

Defendants also argue that Texas' two-year statute of limitations is a bar to substitution. Mr. Moran and Mr. Green died on November 20, 1988 and April 23, 1988, respectively. Defendants argue that, because the statute of limitations runs from the date of the decedent's death, Moran's and Green's actions were barred by the Statute of Limitations as of November 20, 1990 and April 23, 1990.

Moran and Green do not dispute that the Wrongful Death statute of limitations ordinarily runs from the death of the decedent from whose cause of action the wrongful death action is derived. They argue, however, that under Tex.Civ.St. art. 5539b and Fed.R.Civ.P. 15(c), their motion to amend is not barred, because (1) the claim arises out of the same conduct that was alleged in the original product liability action and (2) defendants had adequate notice of the claim.

■ There is some dispute as to whether an amendment not literally covered by Rule 15(c) should be governed by state or federal law in a diversity case. At least one federal district court within this circuit has held that state law should apply. *Bergeron v. Celotex Corp.,* 766 F.Supp. 518, 521 (E.D.La.1991). However, two other district courts have held that Rule 15(c) extends by analogy to amendments that add plaintiffs to complaints. *LeMasters v. K–Mart, Inc.,* 712 F.Supp. 518, 519 (E.D.La.1989); *Pappion v. Dow Chemical Co.,* 627 F.Supp. 1576, 1579 (W.D.La.1986). We need not determine this question in this case, however, because we find that, under either federal or state law, Mrs. Moran's and Mrs. Green's amendments in this case relate back to the original complaint and therefore are not barred by the two-year statute of limitations.

Under established Texas law, the wrongful death actions relate back to the original complaint. *See Bradley v. Etessam,* 703 S.W.2d 237, 242 (Tex.App.—Dallas, 1985)

(writ ref. n.r.e. 1986); *Bradley v. Burnett,* 687 S.W.2d 53, 55 (Tex.App.—Dallas, 1985). Defendants would distinguish these cases by the fact that in both *Etessam* and *Burnett,* plaintiffs had filed within two years of the decedents' deaths. However, in both of these medical malpractice cases, the applicable two-year statute of limitations ran not from the date of death but from the date of last treatment by the defendant-doctor, for both the underlying malpractice claim *and* the wrongful death action. The courts held that *all* statutes of limitations, including the wrongful death statute of limitations, were inapplicable to motions to add wrongful death claims to a timely filed malpractice claim, because the facts underlying both the malpractice claims and the wrongful death claims are identical. The courts noted that it would be an unjust hardship on plaintiffs not to permit them to amend their pleadings to include the wrongful death claim, when such an addition changed neither the factual allegations nor the legal theory of plaintiffs' case. *See also Russell v. Ingersoll–Rand Co.,* 795 S.W.2d 243, 248 (Tex.App.—Houston, 1990) ("If before his death, Mr. Russell had filed suit against the Ingersoll–Rand defendants, plaintiffs could have instituted a wrongful death claims against them" outside the limitations period) (writ granted, 34 Tex.Sup.Ct. Journal 286 (1991)).

Under federal law as well, plaintiffs' amendment relates back to the original complaint. Rule 15(c) provides that "[a]n amendment changing the parties against whom a claim is asserted" relates back if (1) the amended claim arises out of the same conduct set forth in the original pleadings; (2) the party against whom the amended claim is asserted will not be prejudiced in maintaining his defense on the merits; (3) the party against whom the amended claim is asserted knew or should have known that, but for the mistake concerning the identity of the proper party, the action would have been brought against the proper party.

■ Applying this rule to the amendment, we find that the amendment related back to the original pleadings. Under Rule

15(c), "[t]he linchpin is notice, and notice within the limitations period." *Schiavone v. Fortune*, 477 U.S. 21, 31, 106 S.Ct. 2379, 2385, 91 L.Ed.2d 18 (1986). The amendment unquestionably arose out of the same injury as the original pleadings. Defendants also had notice of the amendment within the limitations period. Mrs. Moran and Mrs. Green were plaintiffs in the original complaint. The amendment sought to recover for the injury originally alleged not only as representatives of their husbands' estates, but also as individuals injured in their own right. Defendants are not prejudiced by such an amendment. When plaintiffs filed suit, death loomed large, all knew that plaintiffs could proceed under Texas's Wrongful Death Statute.

In *Williams v. United States*, 405 F.2d 234 (5th Cir.1968), we permitted a similar amendment. In *Williams*, a parent of an injured child originally sued the United States as the child's next friend, seeking recovery for the child's injury from an explosion. Five years after the filing of the original suit, the mother amended her original complaint so that she could appear as a plaintiff in her own right, seeking to recover for loss of services as permitted by Georgia law. The amendment was after time frame of the relevant limitations period.

*Williams* held that the amendment related back to the original pleadings, noting that defendant must have notice "that a legal claim existed in and was in effect asserted by, the party belatedly brought in." *Williams*, 405 F.2d at 238. The court recognized that a different result might be appropriate where the amendment sought to introduce "an entirely unrelated party," but found that the mother's original participation in the lawsuit as a plaintiff gave defendant adequate notice of "the possibility that it might have to defend against a broader claim" by the mother. *Id.* The court concluded that the original pleadings "reasonably indicate a likelihood that the parent would incur losses of a recoverable kind" and that defendant "was put on notice that the parent's claim was also involved," even though that claim was not originally asserted. *Id.* at 239.

By the reasoning of *Williams* the amendment here relates back to the original pleadings. There is no dispute that the amended claims arise out of the same facts as the original pleadings. Like the mother in *Williams*, the spouses seeking to substitute in this case were originally parties to this lawsuit. It was apparent from the original pleadings that Mrs. Moran and Mrs. Green were entitled to recover under Texas's Wrongful Death Statute upon the death of their husbands. Defendants had adequate notice within the limitations period of Mrs. Moran's and Mrs. Green's amended claims, and those claims relate back to the original pleadings under Rule 15(c).

## IV.

We VACATE the district court's order denying Mrs. Moran's and Mrs. Green's motion to substitute themselves individually for their deceased spouses, and we REINSTATE the district court order granting substitution. We VACATE the order granting summary judgment in favor of OCF, and we REMAND the case to the district court for trial. We AFFIRM the summary judgment in favor of STC.