**Milton JOHNSON, Plaintiff,**

v.

**J.C. PENNEY, COMPANY, INC., Defendant.**

**No. 3:93–CV–1639–X.**

United States District Court, N.D. Texas, Dallas Division.

Feb. 21, 1995.

Arthur Martin, Newark, NJ, for plaintiff.

Katie Colopy, Rayne Rosty, Dallas, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Now before the Court is Defendant's Motion for Summary Judgment filed June 13, 1994. After consideration of the motion, the response, the reply and the applicable law, the Court is of the opinion that the motion should be, and hereby is, **GRANTED**.

### BACKGROUND

This action under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq.* and under § 1981 of the Civil Rights Act of 1866, ("§ 1981"), 42 U.S.C. § 1981, stems from the decision of J.C. Penney to terminate the employment of the Plaintiff Milton Johnson ("Johnson"). Johnson began working for J.C. Penney in 1964 as an Assistant Buyer. In 1970 or 1971, Johnson was promoted to the position of Buyer. In 1988, J.C. Penney moved its New York office to Texas and Johnson was asked to relocate to Texas. Johnson continued to work as a Buyer in the Infant's Division until his termination on October 12, 1992.

On September 24, 1992, a female employee, Ms. Lorraine Blackwell was informed that she would be working for Johnson beginning October 1. Ms. Blackwell expressed her reluctance to work with Johnson to her husband, a Senior Buyer with J.C. Penney. Blackwell told her husband of her inability to work for Johnson due to his past offensive and unwelcome behavior. Mr. Blackwell relayed these concerns to Henry Scott, President of the Children's Division. As a result of these conversations, the Personnel Department was notified and an investigation of Blackwell's allegations was undertaken.

On September 25, 1992, Doug Wolsieffer ("Wolsieffer"), Manager of Equal Opportunity Relations, began an investigation by interviewing Blackwell. Blackwell reported specific examples of Johnson's alleged offensive conduct which included unzipping and zipping his pants, and placing his hand on his crotch; asking that Blackwell spend the night with him the next time her husband was out of town; and, placing his arm around her waist. Blackwell also identified other female employees who had had similar expe-

riences with Johnson. Wolsieffer then met with the employees Blackwell had identified as well as other female employees who had worked for or in close proximity to Johnson. In all, Wolsieffer and other personnel managers met with eight different women. All of the women, except one, related specific examples of Johnson's offensive behavior, including: 1) telling a female employee that Johnson had had a dream about having sex with her on a bus or a boat; 2) placing his hand on a pregnant employee's stomach after being told to refrain from doing so; 3) standing in back of an employee as she was leaning over a desk and making physical contact with the employee by pressing the lower part of his body against her with a thrusting motion; and 4) making offensive gestures with his tongue and eyes, sometimes while unzipping and zipping his pants at the same time.

Upon completion of the interviews, Wolsieffer and another personnel employee met with Plaintiff on two different occasions to discuss these allegations. On both occasions, Johnson denied the conduct and requested the names of the women interviewed. For reasons unknown to the Court, Johnson was not given the names. Five of the women complaining about Johnson reduced their allegations to writing and signed the statements. Upon completion of the investigation, a meeting was held on October 9, 1992, between Wolsieffer, R.T. Erickson (Executive Vice President, Director of Personnel), Barger Tygart (Director of Merchandising and Support Operations), Tom Hutchens, (Director of Merchandising) and Don Rose. As a result of this meeting, a third meeting was held with Johnson at which time he was advised of the specific allegations against him.

On October 12, 1992, a meeting was held between Wolsieffer, Henry Scott (President of the Children's Division), Johnson and Ms. Mary Rostad. At the conclusion of the meeting, Johnson was terminated for violating J.C. Penney's policy against sexual harassment.

Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on November 7, 1992.

On May 21, 1993, the EEOC issued a right to sue letter Johnson's request. The EEOC issued the right-to-sue letter based upon the passage of more than 180 days since the filling of the charge and terminated the investigation after its issuance without making a determination. On August 13, 1993, Johnson filed this suit alleging race discrimination, retaliation, intentional infliction of emotional distress, and wrongful termination. J.C. Penney filed this motion seeking summary judgment on all of Johnson's claims.

### ANALYSIS

The movant in a summary judgment context must show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir.1991). The existence of a genuine issue of material fact is determined based on whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986). In other words, "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1504 (5th Cir. 1988). An issue is "material" if it involves a fact that might affect the outcome of the suit under the governing law. *Burgos v. Southwestern Bell Telephone Co.*, 20 F.3d 633, 635 (5th Cir.1994). At the summary judgment stage, a district court may not weigh the evidence or determine the truth of the matter but should only decide the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

■ The rules allocating the burden of proof guide a court in a summary judgment analysis, *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir.1991), and that allocation depends on the burden of proof that would apply at trial. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 150 (5th Cir. 1991). The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Russ v. International Paper Co.*, 943

F.2d 589, 591 (5th Cir.1991), *cert. denied,* 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and wait for trial. *Page v. DeLaune,* 837 F.2d 233, 239 (5th Cir.1988). When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park,* 950 F.2d 272, 276 (5th Cir.1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits and other competent evidence,[1] "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

Although a court must "review the facts drawing all inferences most favorable to the party opposing the motion," *Rosado v. Deters,* 5 F.3d 119, 122 (5th Cir.1993) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)), the nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. The existence of a mere scintilla of evidence will not suffice. *Id.* at 252, 106 S.Ct. at 2512. When the nonmoving party fails to make the requisite showing and the moving party has met his summary judgment burden, the movant is entitled to summary judgment. FED. R.CIV.P. 56(c); *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115, 1119 (5th Cir.1992).

The legal standards applicable to employment discrimination cases contain a dance among shifting burdens of production and proof. First, a plaintiff must establish a *prima facie* case, which gives rise to an inference of discrimination. In the race discrimination context, a plaintiff establishes such a case by demonstrating that (1) he was discharged, (2) was qualified for the position, (3) was within the protected class at the time of discharge and (4) was replaced by someone outside the protected class. *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

■ By establishing a *prima facie* case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against him. *Id.* Next, the burden falls on the defendant to rebut the presumption by producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. *Id.* As the Supreme Court has emphasized, although the burden of production shifts to the defendant, the burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* An employer meets its burden of production in employment discrimination cases by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the employer. *Guthrie v. Tifco Indus.,* 941 F.2d 374, 376 (5th Cir.1991). The defendant's successfully carrying the burden of production rebuts the *prima facie* case, which at that point drops from the case.[2] *St. Mary's,* — U.S. at —, 113 S.Ct. at 2747. The plaintiff then has the opportunity to put on evidence that the defendant's proffered reason was not the true one for the employment decision, but in order to show pretext, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Id.* at —, 113 S.Ct. at 2752 (emphasis in original).

For purposes of this motion, Defendant concedes that Johnson has established a *prima facie* case. The Court concludes that

1. *See* FED R.CIV P. 56(e).

2. It is important to note that whether a defendant carries his burden of production involves no credibility assessment, "[f]or the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Ctr.,* — U.S. at —, 113 S.Ct. at 2748 (emphasis in original). In other words, a court is to take the defendant's rebuttal evidence as true. *Id.*

Defendant has articulated legitimate, nondiscriminatory reasons for Plaintiff's discharge. The analysis must now shift to the third stage of the McDonnell Douglas factors, the issue of pretext. The Court must determine whether Plaintiff has tendered factual evidence that would lead a jury to the reasonable conclusion that Defendant's reasons are a pretext for race discrimination. *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 958 (5th Cir.1993). In particular, Plaintiff must produce sufficient evidence to show that Defendant's reasons were pretextual *for race discrimination. Id.*

A. *Title VII, § 1981 and Retaliation Claims*

When an employer discharges an employee for the reason that he violated the employer's sexual harassment policy by harassing a fellow employee, the pertinent inquiry is whether the decisionmakers believed at the time of the discharge that the employee was guilty of harassment and, if so, whether this belief was the reason for the discharge. The validity or invalidity of the initial complaints is not the central issue, because the ultimate falseness of the complaint proves nothing about the employer, only the complaining employee. *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir.1993). In the case at hand, the inquiry is limited to whether or not J.C. Penney believed, in good faith, the allegations against Johnson and whether the decision to discharge Johnson was based upon that belief.

■ Johnson submits that despite an investigation and three meetings with Johnson himself, that the proffered reason of sexual harassment was pretextual and J.C. Penney acted in bad faith. In support of the contention that the reason given was pretextual, Johnson offers evidence of his own dissatisfaction with his evaluations and his ambiguous references to social problems in his responses to those evaluations. He also points to a single stray remark which Johnson interpreted as a racial disparagement. The single remark was made by Henry Scott, President of the Children's Division, who stated, after Johnson had led a prayer at a Christmas party, that Johnson should have been a preacher. This evidence, even if taken as true, does not show that J.C. Penney's articulated reason was a pretextual reason for race discrimination. A single remark, which on its face is not even racist, cannot provide sufficient evidence to create a *genuine issue of material fact.* While Johnson's disagreements with his evaluations are well-documented, aside from his ambiguous references to social problems (a term encompassing everything from personality conflicts to class differences to racial problems), Johnson never made reference to discrimination or accused the company of disparate treatment due to his race. In fact, no competent evidence has been adduced which would be sufficient to create a genuine issue of material fact as to the issue of pretext.[3]

Although Johnson vehemently contends that the allegations of all five women were false and that his conduct was always above reproach, the relevant question is whether Penney's believed the complaining employees. As the Eleventh Circuit has stated, "[w]e may assume for purposes of this opinion that the complaining employees ... were lying through their teeth." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991). Johnson has submitted no evidence which would create a genuine issue of material fact as to J.C. Penney's bad faith reliance on the complaints. Accordingly, the Court concludes that Johnson has not shown the existence of an issue of material fact as to whether J.C. Penney's explanation for his termination was pretextual and that the Defendant is entitled to summary judgment on the Title VII and § 1981 claims.

---

3. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED.R.CIV.P. 56(e). Many of the statements in Johnson's affidavit fail to satisfy this standard. Johnson refers to double and even triple hearsay he relied upon in his belief that race was the actual reason for his termination which would be inadmissible in court. Johnson's subjective belief that the women who accused him of sexual harassment were "back stabbers" and motivated by their own "personal agenda" does not establish that the final arbiter in the investigation did not rely on these allegations in good faith.

Johnson's failure to prove the existence of a material fact as to whether J.C. Penney's reason was pretextual for discrimination also serves to defeat his claim for retaliation. With regard to Johnson's claim that he was terminated in retaliation for his disagreements about his evaluations and his vague allegations of social problems within his department, Johnson would have to show that "but for" his allegedly protected activities, he would not have been fired. *See McDaniel v. Temple Independent School District,* 770 F.2d 1340 (5th Cir.1985). In accordance with the court's finding that Johnson has failed to show pretext, his claim for retaliation must fail. Defendant is entitled to summary judgment on Johnson's retaliation claim.

### B. *Wrongful Termination*

█ Johnson has also raised a pendant state law claim against J.C. Penney for wrongful termination. As the claim is based in state law, this court is bound by the law of Texas in determining whether the Defendant's motion for summary judgment as to this claim should be granted. *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1142 (5th Cir.1991). Texas adheres to the employment-at-will doctrine, which gives both the employer and the employee the right to terminate the employment relationship at anytime, with or without cause, absent an agreement to the contrary. *Federal Express v. Dutschmann,* 846 S.W.2d 282 (Tex.1993) Thus, in order to sustain an action for wrongful termination, the discharged employee has the burden to prove that the employment relationship was based on the existence of a contract which specifically expressed an intent that the employment was not terminable at will. *Southwest Airlines Co. v. J.J. Jaeger,* 867 S.W.2d 824, 828 (Tex.App.—El Paso, 1993, no writ).

█ Johnson has come forward with no competent summary judgment evidence to prove the existence of any such contract. He only makes vague allegations that there may have been a contract that he signed, but he does not know because he simply signed many documents without reading them during his employment with J.C. Penney. This assertion does create even a scintilla of evidence and will not satisfy his summary judgment burden.

█ In the alternative, Johnson states that the J.C. Penney's employment manual modified his status as an at-will employee. In Texas, case law establishes that if an employment manual has a disclaimer which states that the manual does not constitute a contract that disclaimer will negate any implication that the personnel procedures restrict the at-will relationship. *Federal Express* at 282. The J.C. Penney's handbook states on two separate pages that the handbook is not intended to be a contract:

> [General guidelines] are intended to be just that—guidelines for all associates including supervisory associates—without being so comprehensive and burdensome as to create a contract.... (J.C. Penney Associate Handbook at 17).

> This handbook is not an employment contract, and is not in any way designed to limit your freedom, or the Company's, to respond to situations in a flexible matter.
>                                    (*Id.* at 39).

The court concludes that as a matter of law Johnson was an at-will employee at all times during his employment with J.C. Penney. Therefore, Defendant is entitled to summary judgment on Johnson's claim for wrongful termination.

### C. *Intentional Infliction of Emotional Distress Claim*

█ Johnson has also pleaded a pendant state law claim for intentional infliction of emotional distress. The Texas Supreme Court recently placed its imprimatur on the intentional infliction of emotional distress cause of action, which had been recognized for some time by the courts of appeal. In *Twyman v. Twyman,* the court adopted the tort of intentional infliction of emotional distress as set out in § 46(1) of the RESTATEMENT (SECOND) OF TORTS. 855 S.W.2d 619 (Tex.1993). Under Texas law, to prevail on a claim for intentional infliction of emotional distress, a Plaintiff must establish that the defendant acted recklessly or intentionally; that the conduct was "extreme and outrageous;" and, that the emotional distress suffered by the plaintiff was severe. *Twyman*

at 621; *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989).

In *Wornick Co. v. Casas*, the Supreme Court of Texas addressed whether an employer's conduct surrounding an employee's discharge was sufficiently "extreme and outrageous" to state a claim for intentional infliction of emotional distress. 856 S.W.2d 732 (Tex.1993). In that case, Casas was abruptly terminated and then escorted off the employer's premises by a security guard. The court noted that in Texas, subject to a few very narrow exceptions, employees may be terminated at will and without cause, so that the fact of the discharge itself cannot constitute outrageous behavior as a matter of law. *Id.* at 735. The court held that while being escorted from the premises by a guard could reasonably be expected to cause humiliation or embarrassment, since the action was taken while exercising the company's rights as an employer-at-will it did not, as a matter of law, rise to level of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress. *Id.* The court concluded that:

> Termination of an employee is never pleasant, especially for the employee. But if we accept [plaintiff's] arguments in this case, employers would be subjected to a potential jury trial in connection with virtually every discharge, and 'there would be little left of the employment-at-will doctrine.'
> *Id.* at 736, *quoting Diamond Shamrock Refining and Marketing Co. v. Mendez*, 844 S.W.2d 198 (Tex.1992).

■ In this case, Johnson has alleged intentional infliction of emotional distress by J.C. Penney's concerning his termination, after a substantial investigation, for sexual harassment. Johnson allegations in his complaint and in his response to the motion for summary judgment focus on his own subjective depression and anxiety over the loss of his job and the reason for his termination, rather than any conduct by the company, its agents or employees which would be sufficiently "extreme and outrageous" to support his claim. J.C. Penney's conduct in this case is analogous to the employer's conduct in *Wornick Co. v. Casas* which was found not to be outrageous as a matter of law. Johnson was terminated in a meeting with Scott, Wolsieffer and Rostad. Johnson and Wolsieffer left the meeting together and went to Johnson's office. Johnson then left J.C. Penney's premises. At a later date, Johnson called Wolsieffer to arrange a time to clean out his office. At no time does Johnson allege that any of the three individuals involved in his termination acted unprofessionally, extremely or outrageously. (Deposition of Milton Johnson at 243–44.)

Johnson also alleges that the fact of the termination itself coupled with its alleged illegality is sufficient to constitute extreme and outrageous conduct. However, case law in the Fifth Circuit establishes that exactly the opposite is true. Although an employer's conduct may rise to the level of illegality, except in the *most* unusual cases, it is not normally enough to constitute the "extreme and outrageous" conduct necessary for this cause of action. *See Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir.1991). "Even conduct which may be illegal in an employment context may not be the sort of conduct constituting extreme and outrageous conduct." *Ugalde v. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993). The court concludes as a matter of law that Johnson's assertions do not rise to the level of "extreme and outrageous" conduct necessary to raise an issue of material fact as to Plaintiff's claim of intentional infliction of emotional distress. Therefore, Defendant's motion for summary judgment on this issue is granted.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED**, and all of Plaintiff's causes of action against Defendant shall be **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**