OPINION.
Plaintiff-appellant James Bullock appeals from the trial court's order granting summary judgment in favor of his employer, totes, Inc.,[1] on his age-discrimination claim. In a single assignment of error, Bullock contends that genuine issues of material fact exist as to whether his discharge was a pretext for age discrimination in violation of R.C. 4112.02
and 4112.14.[2] As Bullock has failed to demonstrate under the shifting-burdens framework that totes's justification for his discharge was false, we hold that the evidence is insufficient as a matter of law to establish that totes unlawfully discriminated against Bullock because of his age, and the trial court's judgment is, accordingly, affirmed.
 Facts
Totes manufactures and packages rubber footwear. When discharged by totes, Bullock was a thirty-one-year employee who was fifty-five years of age. He was the shift production supervisor for the second shift at totes's Loveland plant. He had worked as a plant supervisor for twenty-two years. His attendance record was almost perfect, his performance appraisals were satisfactory, and he had no previous record of warnings or disciplinary action.
The facts are undisputed that on June 7, 1996, union stewards representing totes's hourly employees asked to meet with totes's vice president of human resources, Linda Schmidt, about complaints of sexual harassment by current and former female employees against Bullock and a co-employee, Jim Stolz. Schmidt informed the union that she would investigate the claims pursuant to totes's sexual-harassment policy, which required a prompt and confidential investigation.
She interviewed the four complaining hourly employees, Carol Verkamp, Cheryl Dusing, Kim Brinker, and Annette Meader, who related a pattern of abuse by Bullock that included physical touching, verbal abuse, and threats toward second-shift employees between 1994 and 1996. Of eight other hourly employees Schmidt also interviewed, five told her that they were generally aware of rumors, but that they had observed no inappropriate conduct by Bullock. Dave Pfaff, a union steward who worked on the second shift, claimed that he had witnessed incidents described by Verkamp and Dusing. Bea King and Nancy Dotson, second-shift hourly employees, described incidents in which Bullock had fondled Verkamp's hair, rubbed her back, and poked her.
Verkamp, who had returned to the Loveland plant from a layoff six weeks before her interview, told Schmidt that Bullock had referred to her as "Sweet Thing" and "Baby Doll." She said that he had also pinched her side, poked her stomach and rubbed her back. Meador confirmed that Bullock had touched Verkamp, and that she had "followed Carol for protection." Verkamp told Schmidt that while she worked at her station, Bullock would regularly sit close to her and talk while pulling or trimming threads on boots, which was work normally done by hourly employees, but not by supervisors. She told Schmidt that, sometimes, Bullock made her so uncomfortable that she was moved to tears. She told Bullock to leave her alone so that she could do her work. His response was to tell Verkamp not to worry because he knew how to "fix the production number." Pfaff confirmed that Bullock had spent more time at Verkamp's station than at any other hourly employee's and had frequently said that Verkamp "belongs to me."
Cheryl Dusing told Schmidt that Bullock "would always poke me in the side and call me `Baby' * * * To make Bill stay away from me, I would always do horseplay like shooting rubber bands and throwing boots." On one occasion, she said to Bullock that the air nozzle on a machine was too long, and he remarked, "Well * * * mine's not that long." On another occasion, he grabbed her around the waist. She reacted by expressing her displeasure. Pfaff said that he had witnessed this incident, and that Dusing later informed him that she was going to quit. Bullock apologized to her the next day. Kim Brinker told Schmidt that following an argument about whether she had to be at her job station by five minutes before three o'clock, Bullock had told her in front of other employees to get her "skinny little ass" back to work.
The complaining employees told Schmidt that Bullock had frequently said that the devil owed him a debt and paid him back with women. Another expression Bullock regularly used in the presence of the hourly employees was, "I don't get mad; I get even." During her investigation, Schmidt learned of an incident in which Bullock, contrary to company policy, had failed to discipline a male employee and a female employee who had left their workstations together without authority and were found together in a secluded room.
On June 11, Schmidt and the vice president of manufacturing, Edward Talbot, reviewed with Bullock the complaints of sexual harassment against him. They asked him to submit a written statement containing what he remembered of the alleged incidents. He did so the following day and discussed his statement with Schmidt and Talbot.
Bullock acknowledged that he had called Verkamp "sweet thing" and may have spent too much time around her, talking to her more than other employees. He also admitted that he did hit Dusing in the ribs, as witnesses described, but he characterized his actions as tickling. He admitted to cursing Brinker and telling her "to get her skinny ass back to work," which he confessed to Schmidt was a mistake. But he described Brinker as overly forward in her language about her own anatomy, which the investigation confirmed. He described Meador as a troublemaker who had quit her employment with totes. He acknowledged that he had used the expressions "the devil owed him a debt and paid him back with women" and "I don't get mad; I get even." He characterized them simply as expressions that were not reflective of his attitude. Finally, he admitted to Schmidt that, contrary to totes's handbook, he did not report or discipline the two employees who had left their workstations, because it was their first incident, and because he had warned them.
Totes placed Bullock on a leave of absence for the remainder of the investigation. Upon completion of her investigation, Schmidt concluded that Bullock's behavior amounted to workplace sexual harassment and a pattern of deficient supervisory judgment and conduct. Based on Schmidt's investigation, totes's management believed the hourly employees and determined that Bullock presented a significant risk of retaliation against the complaining female employees. Its conclusion was prompted by Bullock's frequent boast around employees, "I don't get mad; I get even." Because the second-shift supervisor was the only management employee alone with the hourly employees, Talbot testified in his deposition, totes elected to discharge Bullock rather than simply to suspend him or to impose a lesser form of discipline. On June 20, 1996, totes notified Bullock in person and by letter of its decision to discharge him:
 We did find some evidence that you violated Company policy regarding sexual harassment. However, ninety-eight percent of the reason for terminating employment is your supervisory failures, that were uncovered during this investigation.
Totes offered Bullock the option to resign. He did resign, but later asked that his resignation be rescinded. Totes then treated his termination as a discharge.
 Summary-Judgment Standard
A motion for summary judgment shall be granted if the court, upon reviewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. See Civ.R. 56(C).
The party moving for summary judgment "bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Dresher v. Burt (1996), 75 Ohio St.3d 280, 293,662 N.E.2d 264, 274. When the moving party discharges its burden, the nonmoving party has the reciprocal burden of producing evidence on the issues for which it bears the burden of production at trial. See id.; see, also, Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115,526 N.E.2d 798, 801.
 Age Discrimination Under R.C. Chapter 4112
It is unlawful for an employer to discharge without just cause or otherwise discriminate against an employee with respect to any matter related to employment because of age. See R.C. 4112.02(A). Furthermore, an employer cannot discriminate against or discharge without just cause an employee "aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job." R.C. 4112.14(A) (former R.C. 4101.17).
The Ohio Supreme Court generally follows the analytic framework established by federal case law for use under Title VII and the Age Discrimination in Employment Act (ADEA), Sections 621through 634, Title 29, U.S. Code, in interpreting and deciding age- discrimination claims brought under R.C. 4112.02 and 4112.14. See Mauzy v. Kelly Services,Inc. (1996), 75 Ohio St.3d 578, 582, 664 N.E.2d 1272, 1276; see, also,Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, 575 N.E.2d 439, syllabus. The analysis is the same for state claims of age discrimination under R.C. 4112.02 and 4112.14. See Byrnes v. LCI Communications HoldingCo. (1996), 77 Ohio St.3d 125, 128, 672 N.E.2d 145, 148.
The ultimate issue under R.C. 4112.02 is whether age was a determining factor in a termination. Absent direct evidence of age discrimination, proof of discriminatory intent is subject to a burden-shifting analysis established by the United States Supreme Court in McDonnell DouglasCorp. v. Green (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824. See Mauzyv. Kelly Services, Inc., 75 Ohio St.3d at 587, 664 N.E.2d at 1279. The purpose for shifting burdens of proof in discrimination claims is to assure that the employee has a day in court despite the unavailability of direct evidence. See St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502,507, 113 S.Ct. 2742, 2747.
To establish a prima facie case of age discrimination, the employee must show that (1) he is a member of a protected class under R.C. 4112.02
or 4112.14; (2) he was subject to an adverse employment decision; (3) he is qualified for the position; and (4) he was replaced by, or his discharge permitted retention of, a person of comparable qualifications outside the protected class. See Mauzy v. Kelly Services, Inc.,75 Ohio St.3d at 582, 664 N.E.2d at 1276; see, also, Weiper v. W.A. Hill Assoc. (1995), 104 Ohio App.3d 250, 262, 661 N.E.2d 796,804.
If the employee can establish a prima facie case by a preponderance of the evidence, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer articulates a nondiscriminatory reason, then the presumption of discrimination raised by the prima facie case is rebutted, and the employee's burden is to prove that the employer's articulated reason for the discharge is a pretext for discrimination. See id.; see, also, Weiper v. W.A. Hill Assoc.,104 Ohio App.3d at 263, 661 N.E.2d at 796. But the burden of persuasion remains at all times with the employee. See Reeves v. Sanderson Plumbing Prod., Inc.
(2000), 530 U.S. 133, ___, 120 S.Ct. 2097, 2106. To establish pretext, the employee must show by a preponderance of the evidence that the employer's proffered reason is not worthy of credence or that discriminatory reasons "more likely" motivated the employer's decision.Id. at ___, 120 S.Ct. at 2106, citing Texas Dept. of Community Affairsv. Burdine (1981), 450 U.S. 248, 255-256, 101 S.Ct. 1089, 1095.
 Bullock's Prima Facie Case
Totes contends that Bullock did not establish a prima facie case because the record fails to show that he was replaced by a person outside the protected class, as required by the fourth part of the McDonnellDouglas test. Totes argues that Bob Mills, who replaced Bullock as second-shift supervisor, was forty-five years of age. Bullock counters that Cheryl Young, who was thirty-nine, actually replaced him, but that following Bullock's letter threatening a lawsuit, totes replaced her with Mills. Totes contends that Young was only a temporary substitute supervisor assigned to cover the supervisor shortage created by Bullock's termination until it could hire an additional supervisor.
Whether Young or Mills replaced Bullock is not critical to the fourth part of Bullock's prima facie case of age discrimination under McDonnellDouglas. R.C. 4112.02 prohibits discrimination because of age and, pursuant to R.C. 4112.14, relates to persons forty years or older much like the prohibition under the ADEA, Section 623(a)(1), Title 29, U.S.Code. "The fact that one person in the protected class has lost out to another person is thus irrelevant, so long as he lost out because of his age." O'Connor v. Consolidated Coin Caterers Corp. (1996),517 U.S. 308, 312, 116 S.Ct. 1307, 1310. For age-discrimination claims, the United States Supreme Court has modified the fourth part of theMcDonnell Douglas test, holding that an employee is not required to establish that he was replaced by another outside the protected class, but only that the replacement was "substantially younger." See id. at 313, 116 S.Ct. at 310. Accordingly, we hold that there is sufficient evidence in the record to establish a prima facie case of age discrimination under the McDonnell Douglas test and to shift the burden of production to totes, thus requiring it to justify Bullock's discharge.
 Totes's Justifications for Discharge
Although we hold that Bullock established a prima facie case, evidence of the falsity of totes's explanation for his discharge is totally lacking and cannot support an inference that his discharge was a pretext for intentional age discrimination.
In Reeves v. Sanderson Plumbing Products, Inc., the United States Supreme Court recently addressed pretextual assertions for discharge. It concluded that when an employee alleges disparate treatment, "liability depends on whether [age] actually motivated the employer's decision." 530 U.S. at ___, 120 S.Ct. at 2105, citing Hazen Paper Co. v. Biggins
(1993), 507 U.S. 604, 113 S.Ct. 1701. Employing the McDonnell Douglas
framework, the Supreme Court held that an employee's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at ___, 120 S.Ct. at 2109. The Court observed that the trier of fact may reasonably infer that the employer's explanation, if false, is an attempt to "cover up a discriminatory purpose." Id. at ___, 120 S.Ct. at 2108.
As evidence that totes's asserted justification for firing him was false, Bullock contends that totes treated nonprotected employees more favorably when they committed comparable disciplinary infractions. Bullock cites instances in which totes did not discharge either an employee involved in a consensual relationship with a female supervisor or a supervisor who was exonerated after testing positive for marijuana on a drug screen.
Here, as in Title VII cases, the employee claiming disparate treatment must compare himself to those co- employees receiving punishment who are "similarly situated in all respects." Mitchell v. Toledo Hospital
(C.A.6, 1992), 964 F.2d 577, 583. To be "similarly situated," the employees with whom the employee makes the comparison to establish disparate treatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."Id.; see, also, Bucher v. Sibcy Cline, Inc. (2000), 137 Ohio App.3d 230, ___ N.E.2d ___. The conduct of the individuals cited by Bullock is distinguishable. A consensual, extramarital sexual relationship and a violation of totes's drug policy are not comparable to violations of an employer's sexual-harassment policy with the attendant consequences of supervisor liability under R.C. 4112.02.
 Evidence Relating to Pretext
As the result of Schmidt's investigation, Bullock's behavior was determined by totes to constitute a pattern of unwelcome behavior, sufficiently severe and pervasive to constitute supervisor sexual harassment. See Harris v. Forklift Systems, Inc (1993), 510 U.S. 17,21, 114 S.Ct. 367, 370. When an employer discharges an employee for violating its sexual-harassment policy, the relevant inquiry is whether the employer investigated in good faith, and whether, at the time of discharge, the employer "honestly believed that the employee committed the infraction." Beene v. St. Vincent Mercy Med. Ctr. (N.D.Ohio. 2000),111 F. Supp.2d 931, 937, citing Harris v. Electronic Data Sys. Corp.
(C.A.6, 1996), 78 F.3d 584. The supervisor's superior position over subordinates, as it is perceived by employees, renders a supervisor's misconduct more serious than the same conduct committed by a co-worker. See Burlington Industries, Inc v. Ellerth (1998), 524 U.S. 742, 761-762,118 S.Ct. 2257, 2269.
An employer is also liable in common-law tort under respondeatsuperior for failing to provide a safe workplace for its employees, if it has knowledge of a supervisor's history of sexually harassing behavior and "sit[s] idly by." Kerans v. Porter Paint Co. (1991),61 Ohio St.3d 486, 493, 575 N.E.2d 428, 433-434. According to the Supreme Court of Ohio, the appropriate response is to fire the supervisor or to place him in a position where he does not pose a threat to females. See id.
Bullock acknowledged the incidents described by Verkamp, Dusing and Brinker. Unlike in Reeves, Bullock cannot identify any evidence of statements by totes management reflecting age bias in the workplace. Bullock now maintains that his misconduct was trivial and nothing more than workplace frolic. He contends that the complaints were exaggerations, and that they resulted from grudges. In trying to discredit the complaints, he necessarily concedes that his discharge was motivated by totes's concern about a hostile work environment. He disputes only that his conduct was so severe and pervasive as to amount to supervisor sexual harassment. But Bullock cannot defeat summary judgment merely by contesting his employer's decision.
He claims that the letter of discharge, which stated that he had violated totes's sexual harassment policy, but that "ninety-eight percent of the reason for terminating employment is your supervisory failures," was evidence of totes's pretextual firing. Schmidt admitted that Bullock was totes's best documenter and supervisor. She also conceded that he probably wrote up individuals when another supervisor would not have done so. But, in our view, Bullock misapprehends the significance of totes's letter of discharge. Schmidt's investigation disclosed what totes believed to be a pattern of sexual harassment by Bullock in his capacity as supervisor, with a resulting change in the working conditions of certain hourly employees because of their sex.
Here, Bullock's own conduct toward female employees in his supervisory capacity was the very source of the unreported improper conduct. His statements about getting even, which he regularly repeated, as well as the fear by female employees that he might retaliate against them because they took their grievances to the union, reasonably justified totes's response, which was to fire him.
 Conclusion
Bullock has not identified in the record genuine issues of material fact sufficient to support an inference that totes's reasons for discharging him were a pretext for age discrimination. This assignment of error is overruled.
Therefore, the judgment of the trial court is affirmed.
Hildebrandt, P.J., and Painter, J., concur.
[1] The initial lower-case letter in the company's name is stylistically how the company itself is identified in the record.
[2] Bullock has not appealed the trial court's order granting summary judgment in favor of totes on his claim for handicap discrimination.