**BUCHER, Appellant,**

v.

**SIBCY CLINE, INC., Appellee.**

[Cite as *Bucher v. Sibcy Cline, Inc.* (2000), 137 Ohio App.3d 230.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–981014.

Decided Feb. 4, 2000.

*Freking & Betz, Randolph H. Freking* and *Tamara F. Stenzel,* for appellant.
*Lindhorst & Dreidame* and *James M. Moore,* for appellee.

*Per Curiam.*

Plaintiff-appellant Jayne Bucher has taken the instant appeal from the trial court's entry directing verdicts for defendant-appellee Sibcy Cline, Inc., on Bucher's gender-discrimination, age-discrimination, and sexual-harassment claims. Bucher advances on appeal five assignments of error, in which she challenges the entry of directed verdicts on the discrimination and harassment claims and the court's pretrial entry of summary judgment for Sibcy Cline on her breach-of-contract and promissory-estoppel claims. For the reasons that follow, we conclude that the trial court properly entered summary judgment for Sibcy Cline on Bucher's contract and promissory-estoppel claims, but improvidently directed verdicts for the defendant on her discrimination and harassment claims.

On March 1, 1996, Sibcy Cline terminated Bucher's employment with the company. On January 24, 1997, Bucher filed an action in Hamilton County Common Pleas Court. In her complaint, Bucher cited her firing as the basis for breach-of-contract and promissory-estoppel claims and federal and state statutory and state public-policy claims of gender and age discrimination. She further cited the conduct of two Sibcy Cline employees as the basis for federal and state sexual-harassment claims.[1]

Sibcy Cline subsequently moved for summary judgment on the claims. By entry dated December 9, 1997, the trial court denied the motion as to Bucher's gender-discrimination, age-discrimination, and sexual-harassment claims, but granted the motion as to her breach-of-contract and promissory-estoppel claims.

The matter proceeded to trial before a jury on the gender-discrimination, age-discrimination, and sexual-harassment claims. At the close of Bucher's case-in-chief, Sibcy Cline moved for directed verdicts on the claims. The trial court denied the motion. At the close of all evidence, Sibcy Cline renewed its motion for directed verdicts. By entry dated November 30, 1998, the trial court, for the

---

1. Bucher also stated in her complaint, but later voluntarily dismissed, claims for assault and battery, intentional infliction of emotional distress, retaliation, and breach of the covenant of good faith and fair dealing.

reasons "dictated * * * into the record" on November 9, directed verdicts for Sibcy Cline on all of Bucher's claims. From that judgment, Bucher has appealed.

## I. Summary Judgment

We address first the challenge advanced by Bucher in her fifth assignment of error to the entry of summary judgment for Sibcy Cline on her breach-of-contract and promissory-estoppel claims. This challenge is untenable.

The standard governing the disposition of Sibcy Cline's motion for summary judgment is set forth in Civ.R. 56. Pursuant thereto, a party against whom a claim is asserted may move, with or without supporting affidavits, for summary judgment in his favor on all or any part of the claim. See Civ.R. 56(A). A motion for summary judgment may be granted if the court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines (1) that no genuine issue of material fact remains to be litigated, (2) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion, and (3) that the moving party is entitled to judgment as a matter of law. See *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; Civ.R. 56(C).

Bucher sought in her ninth claim for relief to recover for her employer's alleged breach of its express or implied contractual obligation to discharge her from her employment only for just cause. In her seventh claim for relief, she sought enforcement, under the doctrine of promissory estoppel, of alleged assurances of job security.

Bucher was not employed by Sibcy Cline under a formal written contract of employment. As a general rule, employment under an oral agreement is "at will," and either party may terminate the employment relationship at any time for any reason not contrary to law. See *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104, 19 OBR 261, 264–265, 483 N.E.2d 150, 154.

The terms of an oral at-will employment relationship may be altered, however, by implied or express contractual obligations that arise from company handbooks, policies, practices, or oral representations, or by promises or representations that may be enforced under the doctrine of promissory estoppel. See *id.* Bucher contends, in support of her challenge to the entry of summary judgment for Sibcy Cline on her breach-of-contract and promissory-estoppel claims, that issues of fact remain as to whether the company's handbook, policies, practices, or oral representations imposed upon Sibcy Cline an obligation to discharge her only for just cause. This contention is feckless.

■ Bucher offered, in opposition to the motion for summary judgment, the 1987, 1991, and 1995 versions of the "Sibcy Cline, Inc. Exempt Employee" handbook. She also offered testimony, by way of both deposition and affidavit, to her "underst[anding]," throughout her tenure at Sibcy Cline, that the handbook afforded her a right to be discharged from her employment only for just cause. This contention is belied, however, by the handbook editions themselves, none of which contains a provision that might reasonably be construed to extend to any employee a right to be terminated only for just cause. Therefore, the handbook cannot be said to have altered the terms of the parties' at-will employment relationship.

■ Bucher also offered testimony to alleged verbal assurances of job security made to her by Sibcy Cline's chief financial officer and the company's human resources director. Under the doctrine of promissory estoppel, " '[a] promise [that] the promisor should reasonably expect to induce action or forbearance on the part of the promisee * * * and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise * * * .' " *Mers, supra,* at 104, 19 OBR at 265, 483 N.E.2d at 154 (quoting 1 Restatement of the Law 2d, Contracts [1981] 242, Section 90). Bucher failed, however, to present evidence of any detrimental action or forbearance from action on her part, taken in reliance upon the alleged assurances. Therefore, the at-will nature of Bucher's employment relationship with Sibcy Cline cannot be said to have been altered by verbal assurances of job security enforceable under the doctrine of promissory estoppel.

■ Finally, Bucher offered testimony by which she sought to establish an entitlement to progressive disciplinary measures short of termination. Sibcy Cline's human resources director testified in her deposition that the company routinely used "counseling statements" to document employee malfeasance and to provide the miscreant with notice and an opportunity to respond. She testified that the miscreant would then "generally" be afforded an opportunity to "correct his behavior." She stated, however, without contradiction in the record, that rehabilitative opportunities were not "required" and were not afforded when the miscreant was, as Bucher was alleged to have been, insubordinate. Bucher thus failed to show that the process set in motion by the filing of a counseling statement afforded her a contractual right to some disciplinary measure short of termination or that the counseling-statement procedure embodied a "promise" of progressive discipline enforceable under the doctrine of promissory estoppel. Therefore, Bucher's at-will relationship with Sibcy Cline cannot be said to have been altered by the company's counseling-statement procedure.

We hold that the trial court properly entered summary judgment for Sibcy Cline on Bucher's breach-of-contract and promissory-estoppel claims, when no

issues of fact remained as to whether the company's handbook, policies, practices, or oral representations altered the at-will nature of Bucher's employment relationship with Sibcy Cline. Accordingly, we overrule the fifth assignment of error.

## II. Directed Verdicts

The balance of Bucher's assignments of error challenges the trial court's entry, at the close of all evidence, of directed verdicts for Sibcy Cline on Bucher's gender-discrimination, age-discrimination, and sexual-harassment claims. Civ.R. 50(A), which permits a party to an action to move for a directed verdict in his favor at the close of all the evidence, provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

The determination of a motion for a directed verdict does not entail an inquiry into the weight of the evidence or the credibility of the witnesses. See *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469. The motion, instead, presents a question of law, into "the legal sufficiency of the evidence to take the case to the jury." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 116, 430 N.E.2d 935, 938. The trial court must, therefore, deny a motion for a directed verdict if "substantial competent evidence [has been adduced] to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions." *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 244, 363 N.E.2d 367, 368; accord *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 33, 697 N.E.2d 610, 618.

## A. The Discrimination Claims

In her first, second, and fourth assignments of error, Bucher challenges the entry of directed verdicts for Sibcy Cline on the gender- and age-discrimination claims advanced in counts one through five of her complaint. We find this challenge to be well taken.

Forty-two-year-old Bucher's twelve-year tenure with Sibcy Cline's accounting department ended on March 1, 1996, after a verbal altercation between Bucher and her direct supervisor, Nancy Sabatka. Bucher had been transferred to Sabatka's direct supervision from the direct supervision of Sibcy Cline's chief financial officer, William Borek, in the late 1980s. Bucher testified at trial that Sabatka had appeared at her desk on the morning of March 1 to advise her of

management's decision to remove an employee from Bucher's supervision. Bucher's concern over the effect of this removal on her department's performance prompted her to question why she had not first been consulted. Sabatka responded that Bucher had been the subject of "complaints" and that Bucher might benefit from "management courses." When Sabatka declined to elaborate on the nature or sources of the "complaints," Bucher "shook [her] head" and suggested that "management courses" might instead prove more beneficial to Sabatka. Bucher testified that, over the course of their relationship, she and Sabatka had engaged in, but had ultimately survived, several heated exchanges. She was consequently confounded by Sabatka's parting suggestion, upon disengaging from the affray, that she should perhaps seek employment elsewhere.

Sabatka testified at trial to a version of the morning's events that was substantially similar in its particulars to Bucher's version, with the addition of Sabatka's characterization of Bucher's "attitude" during the exchange as "angry," "nasty," and "mean." After the exchange Sabatka proceeded to the office of her supervisor, William Borek. Sabatka related the incident to Borek and declared that she could no longer tolerate Bucher's "outbursts." Sabatka and Borek did not discuss alternative disciplinary measures or a possible change in supervision. Sabatka instead presented to Borek (in a manner that, she admitted, amounted to an ultimatum) her "recommend[ation]" that Bucher be discharged. Borek testified that he agreed to support Sabatka in the action, based on the decade-long, yet concededly undocumented, history of animosity between Sabatka and Bucher, and without further inquiry into the morning's incident or regard for Bucher's predominantly favorable job-performance record.

At approximately 5:00 p.m., Sabatka again appeared at Bucher's desk and advised her that her employment had been terminated. Sabatka declined to elaborate on the reasons for Bucher's discharge, but merely offered Bucher the option of clearing her desk then or at a later date. Sabatka later returned to find Bucher clearing her desk and told Bucher that she had been discharged "because of what [had] happened th[at] morning."

Bucher's dissatisfaction with Sabatka's explanation for her discharge prompted her to telephone Borek a few days later. Borek told Bucher that she had been terminated for "insubordination," but he declined to specify the offending conduct.

Sibcy Cline's human resources director testified at trial that she had gleaned from her subsequent discussion of the matter with Sabatka that Bucher had been terminated, not because of her "disagreement" with Sabatka, but because she had "resist[ed] and challeng[ed] Sabatka's authority" by displaying an "unwillingness to follow [Sabatka's] directive" regarding management training. The human resources director, whom company management regularly consulted on matters

involving employee discipline and interpretation of the employee handbook, opined that Bucher's conduct, as described to her, constituted "insubordination," which the handbook listed among other "serious offenses" as a ground for "possible involuntary terminatio[n]."

Bucher stated in her complaint a federal gender-discrimination claim under Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code ("Title VII"); a federal age-discrimination claim under the Age Discrimination in Employment Act, Section 621 *et seq.*, Title 29, U.S.Code ("ADEA"); a state gender-discrimination claim under R.C. 4112.02(A); and a state age-discrimination claim under both R.C. 4112.02(A) and R.C. 4112.14(A). She also stated, in count five of her complaint, an additional wrongful-discharge claim based upon the public policy embodied in Ohio's anti-discrimination statutes. See *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraphs one, two, and three of the syllabus (in which the Supreme Court carved out a public-policy exception to the employment-at-will doctrine by recognizing a common-law tort action for wrongful discharge or disciplinary action in violation of a state statute).

Title VII deems unlawful an employer's decision "to discharge any individual, or otherwise to discriminate against any individual with respect to his * * * terms [or] conditions * * * of employment, because of such individual's * * * sex." Section 2000e–2(a)(1), Title 42, U.S.Code. The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his * * * terms [or] conditions * * * of employment, because of such individual's age * * *." Section 623(a)(1), Title 29, U.S.Code. Ohio's general anti-discrimination statute, R.C. 4112.02(A), defines as an "unfair discriminatory practice" an employer's "discriminat[ion] * * * against [any] person with respect to * * * tenure, terms [or] conditions * * * of employment," "because of the * * * [person's] sex * * * [or] age * * *." And R.C. 4112.14(A), with greater specificity, prohibits an employer from "discharg[ing] without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee."

Ohio courts examine Title VII, ADEA, and state employment-discrimination claims under federal case law interpreting Title VII. See *Plumbers & Steamfitters Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202–203, 421 N.E.2d 128, 131. Title VII jurisprudence imposes upon the plaintiff the initial burden of establishing a prima facie case of discrimination. See *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677–678. The establishment of a prima facie case gives rise to a reciprocal burden on the part of the employer "to articulate some legitimate,

nondiscriminatory reason" for its action. *Id.* If the employer carries its burden, the plaintiff must then be afforded "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were, a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215.

 A plaintiff may establish a prima facie case of employment discrimination by presenting evidence that an employer more likely than not was motivated in its employment action by a discriminatory intent. See *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272, paragraph one of the syllabus. An employer's discriminatory intent may be shown by direct evidence, or it may be inferred from the evidence upon application of the analytical framework established by the United States Supreme Court in *McDonnell Douglas Corp., supra.* See *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439, syllabus. Thus, in the absence of direct evidence of discrimination, a prima facie case of employment discrimination may be established by proof (1) that the plaintiff was a member of a protected class, (2) that he suffered an adverse employment action, (3) that he was qualified for the position he lost, and (4) either that he was replaced by someone outside the protected class, see *McDonnell Douglas Corp., supra,* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–678, or that "a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582 (citing *Davis v. Monsanto Chem. Co.* [C.A.6, 1988], 858 F.2d 345, certiorari denied [1989], 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028). Accord *Kohmescher, supra.*

Bucher presented at trial evidence sufficient to demonstrate that she was, for purposes of both the gender- and age-discrimination claims, a member of a protected class, and that Sibcy Cline had discharged her from a job for which she was qualified. The trial court, however, in directing verdicts for Sibcy Cline on the discrimination claims at the close of all evidence, essentially determined that the evidence adduced at trial was insufficient as a matter of law to satisfy the fourth prong of the *McDonnell Douglas* analysis. Thus, the court effectively concluded that Bucher had failed to sustain her burden of establishing a prima facie case of gender or age discrimination. Our review of the record leads us to a contrary conclusion.

 The trial court specifically concluded that Bucher had failed to support her gender-discrimination claim with evidence sufficient to show that Sibcy Cline had treated a "comparable" male employee more favorably. The court similarly found that Bucher had failed to support her age-discrimination claim with evidence sufficient to show either that Sibcy Cline had treated a "comparable" younger employee more favorably or that her job responsibilities, which had

subsequently been absorbed by five existing employees, had been usurped by a younger, and hence "non-protected," person.

To prove that "a comparable non-protected person was treated better," the plaintiff "must show that the 'comparabl[e]' [was] similarly-situated in all respects." *Mitchell, supra,* at 583. The "respects" in which the "comparabl[e]" must be "similarly-situated" depend on "the factual context in which the * * * case arose * * *." *Ercegovich v. Goodyear Tire & Rubber Co.* (C.A.6, 1992), 154 F.3d 344, 352. Thus, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, * * * the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Id.* at 352 (quoting *Pierce v. Commonwealth Life Ins. Co.* [C.A.6, 1994], 40 F.3d 796, 802). When, as here, the plaintiff has alleged "discriminatory disciplinary action resulting in the termination of [her] employment, * * * 'the individua[l] with whom the plaintiff seeks to compare * * * her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* at 352 (quoting *Mitchell, supra,* at 583).

Bucher adduced at trial evidence of disparate disciplinary action meted out for rule infractions committed by two male Sibcy Cline employees. Larry Fisher was a computer software specialist in the accounting department, under the direct supervision of Nancy Sabatka. Sabatka and her supervisor, William Borek, acknowledged in their testimony at trial that Fisher had had "attendance problems" and had failed to meet project deadlines. Company management addressed Fisher's "attendance problems" through the company's "counsel[ing]" procedure, and Sabatka admonished Fisher for his failure to meet project deadlines. Sabatka's admonition prompted Fisher to complain to Borek that Sabatka had become "too involved" in his project. Borek placated Sabatka with an explanation of the extenuating circumstances of the project delays and later assumed direct supervisory responsibility over all computer personnel. Fisher was, at the time of his offending conduct, under forty years of age.

Dean Doughty was a regional sales manager for Sibcy Cline, under the direct supervision of Borek. In January 1995, the company ordered Doughty to undergo sensitivity training for a sexist remark he had made during a management meeting. Borek testified that, although he had heard the remark and thought that it was "inappropriate," he had "let [it] go," because he perceived it as having been made in jest. Only after a female employee complained about the remark to the company's human resources director and to the company's owner

and president, Robert Sibcy, did management look into the matter and settle upon a sanction. Doughty subsequently completed the sensitivity training and was warned that any further violation of the company's policy against sexual harassment might subject him to further discipline, including the termination of his employment.

Subsequent events (the particulars of which Doughty, at trial, denied) called into question the efficacy of the disciplinary measure imposed on Doughty for his January 1995 transgression. Bucher testified that sometime thereafter, as she stood in the reception area of the company's headquarters, conversing with the receptionist, Doughty approached her from behind and stuck his tongue in her ear. Bucher immediately reported the incident to Sabatka and conveyed to Sabatka her sense of humiliation and her desire to protect others from Doughty's predations.

Company management, however, initiated neither investigatory nor disciplinary action against Doughty. Sabatka testified that Bucher had expressed to her some reservations about pursuing the matter (the experience or expression of which Bucher, in her testimony, denied). Nonetheless, Sabatka, compelled by the "serious[ness]" and "offensive[ness]" of Doughty's conduct, reported the incident to Borek.

Both Sabatka and Borek viewed Doughty's conduct as constituting the "serious offense" of "conduct unbecoming" an employee in Doughty's position. Borek testified that he had considered terminating Doughty. He asserted, however, that he had been reluctant to take disciplinary action without an investigation and that he had felt constrained from investigating the matter because of Bucher's desire, conveyed to him through Sabatka, that it not be pursued. Doughty thus remained undisciplined and in Sibcy Cline's employ, and Bucher continued to encounter him regularly in the course of her employment duties, but without any repetition or discussion of his offending conduct. Bucher testified that, although the tongue-in-the-ear incident did not prevent her from doing her job, it made working with Doughty "more difficult."

The Sibcy Cline employee handbook listed as grounds for "involuntary termination" (in addition to the "offens[e]" of "[i]nsubordination" for which Bucher was ostensibly fired) the "offenses" of "[e]xcessive absences or tardiness," "[v]iolation of [c]ompany rules," and "acts or conduct unbecoming a worker in [the offender's] position." Sibcy Cline's human resources director testified at trial that the handbook's roster of "serious offenses" that would provide grounds for termination could be read to encompass excessive tardiness, a failure to complete assignments or to follow a supervisor's instructions, discriminatory remarks, and sexual harassment.

The evidence thus shows that Borek was the ultimate arbiter with respect to the discipline to be imposed for Bucher's insubordination, Fisher's failure to meet project deadlines, and Doughty's "conduct unbecoming." Bucher and her alleged "comparables" must, therefore, be said to have dealt with the same supervisor. The evidence also supports a determination that Bucher and her alleged comparables, being subject to the ultimate judgment of the same supervisor and to the standards of conduct set forth in the employee handbook, were subject to the same standards. Cf. *Mitchell, supra,* at 583 (holding that an employee handbook alone was insufficient to prove the "same standards" element, when the plaintiff and the alleged comparable did not deal with the same supervisor). Finally, upon the evidence adduced at trial, reasonable minds could differ as to whether the offending conduct of Fisher and Doughty was of "comparable seriousness" to the offending conduct of Bucher, see *id.* at 583, fn. 5 (quoting *Lanear v. Safeway Grocery* [C.A.8, 1988], 843 F.2d 298), or whether Fisher and Doughty's conduct presented such "differentiating or mitigating circumstances" as to explain their more favorable treatment. See *id.* at 583.

We, therefore, conclude that Bucher sustained the burden imposed by both her gender- and age-discrimination claims of presenting evidence sufficient as a matter of law to demonstrate that she and her alleged comparables were similarly situated in all relevant respects and that Sibcy Cline had accorded these comparable non-protected employees more favorable treatment. This same evidence, moreover, coupled with Bucher's personnel file, which reflected her theretofore spotless employment record, provided a factual predicate for a conclusion that the nondiscriminatory reason posited by Sibcy Cline for terminating Bucher, *i.e.,* her conduct on March 1, 1996, was pretextual.

The record thus discloses substantial and competent evidence, upon which reasonable minds might differ, to support a prima facie case of gender and age discrimination and to prove that the nondiscriminatory reason offered by Sibcy Cline for Bucher's termination was a pretext for discrimination. We, therefore, hold that the trial court erred in directing verdicts for Sibcy Cline on Bucher's discrimination claims. Accordingly, we sustain the first, second, and fifth assignments of error.

### B. The Sexual–Harassment Claims

In her third assignment of error, Bucher challenges the entry of directed verdicts for Sibcy Cline on the sexual-harassment claims advanced under R.C. Chapter 4112 and Title VII and set forth in counts ten and eleven of her complaint. This challenge is well taken.

Bucher presented at trial, in addition to the evidence of Doughty's transgressions, testimony regarding the conduct of Sibcy Cline's president and proprietor,

Robert Sibcy. Bucher testified that Sibcy, upon encountering her in the company's administrative offices, would regularly put his arm around her, hold her close, and ask about her day, and that, on three or four occasions, he had "pat[ted her] on the butt." She stated that she perceived Sibcy's conduct as inappropriate, that it embarrassed, offended and discomfited her, and that, although it did not prevent her from doing her job, it made working with Sibcy "more difficult." She asserted, however, that she felt constrained from either physically or verbally communicating her distaste to Sibcy because of his position in the company. Moreover, she stated that, although she did not avail herself of the company's formal complaint procedure, she did discuss the matter with her direct supervisor, Sabatka.

Sibcy, in his trial testimony, conceded that he had, on one occasion, put his arm around Bucher to congratulate her for her part in winning a company softball game. He denied, however, that he had ever touched her on the buttocks.

 The protections afforded employees by the federal and state statutory proscriptions against gender-based employment discrimination extend to an employee subjected by his employer to a sexually hostile work environment. See *Meritor Sav. Bank v. Vinson* (1986), 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59–60. To establish a hostile-environment sexual-harassment claim, the plaintiff must demonstrate (1) that he was a member of the protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based upon the plaintiff's sex; (4) that the harassment was sufficiently "severe or pervasive" as to create a hostile or abusive work environment and " 'to alter the conditions of [the plaintiff's] employment' "; and (5) that the employer may be held either directly or vicariously liable. See *Meritor Sav. Bank, supra* at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60 (quoting *Henson v. City of Dundee* [C.A.11, 1982], 682 F.2d 897, 904); see, also, *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 270, 642 N.E.2d 395, 399–400 (citing *Harris v. Forklift Systems, Inc.* [1993], 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295).

The evidence adduced at trial was legally sufficient to show that Sibcy and Doughty had subjected Bucher to unwelcome, sex-based harassment. The evidence also provided a basis for holding Sibcy Cline directly liable for the conduct of Sibcy, who, as the company's president and proprietor, "was indisputably within that class of [company] officials who may be treated as the organization's proxy," see *Faragher v. City of Boca Raton* (1998), 524 U.S. 775, 789, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662, 667, and for the conduct of Doughty, when reasonable minds could differ as to whether the company's "response" (or lack thereof) to Bucher's complaint about her coworker's conduct "manifest[ed] indifference or unreasonableness in light of the facts the [company] knew or should

have known." See *Blankenship v. Parke Care Ctrs.* (C.A.6, 1997), 123 F.3d 868, 873, certiorari denied (1998), 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105.

 However, sexual harassment constitutes actionable sex discrimination only when the harassment alters the terms or conditions of employment. The determination of whether sexual harassment was severe or pervasive enough to create a hostile or abusive work environment and to thereby alter the terms or conditions of employment entails an examination of "all the circumstances," taken as a whole, including the "frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the] employee's work performance." *Harris, supra,* at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–303; accord *Faragher, supra,* at 787–788, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; see, also, *Williams v. General Motors Corp.* (C.A.6, 1999), 187 F.3d 553, 562–563 (holding that the *Harris* totality-of-the-circumstances test focuses upon the harassing conduct in the "[a]ggregat[e]," without regard for the identity of its perpetrator).

 The circumstances must be judged under both an objective and a subjective standard, *i.e.,* the harassment must be severe or pervasive enough to create a work environment that a reasonable person would perceive as hostile or abusive and as altering the terms or conditions of employment, and the plaintiff must subjectively regard his work environment as hostile or abusive and so altered. See *Black v. Zaring Homes, Inc.* (C.A.6, 1997), 104 F.3d 822, 826 (citing *Harris, supra,* at 21–22, 114 S.Ct. at 370–371, 126 L.Ed.2d at 301–302); accord *Faragher, supra,* at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676. For the conduct to have interfered with the employee's work performance, it need not have caused "a tangible psychological [or economic] injury." See *Harris, supra,* at 21, 25, 114 S.Ct. at 370, 372, 126 L.Ed.2d at 302 (O'Connor, J., for the court, and Ginsburg, J., concurring). "[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Id.* at 25, 114 S.Ct. at 372, 126 L.Ed.2d at 304 (Scalia, J., concurring). Thus, "[i]t suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to 'ma[k]e it more difficult to do the job.'" *Id.* at 25, 114 S.Ct. at 372, 126 L.Ed.2d at 304 (Ginsburg, J., concurring, quoting the race-discrimination case *Davis v. Monsanto Chem. Co., supra,* at 349); accord *Williams, supra,* at 567.

 Bucher testified that she was humiliated by Doughty's conduct; that she was offended, embarrassed, and discomfited by Sibcy's conduct; that Sibcy's position in the company left her feeling powerless to prevent a recurrence of his conduct; and that her harassers' conduct made working with them "more

difficult." Moreover, she showed that her complaint about Doughty's conduct, which had been conveyed by her supervisor to the company's chief financial officer, had come to naught. Bucher thus established that this unwelcome, physically offensive, sex-based conduct had caused her to subjectively perceive her work environment as sufficiently hostile and abusive as to make it more difficult to do her job. Further, upon the evidence adduced at trial, reasonable minds could differ as to whether the conduct of Bucher's harassers was severe or pervasive enough to create an objectively hostile or abusive work environment and whether a reasonable person, subjected to this environment, would have found, as Bucher did, that it so altered her working conditions as to make it more difficult to do her job.

We conclude that reasonable minds could differ as to whether, under the totality of the circumstances, Bucher was subjected to sexual harassment that was, as both a subjective and an objective matter, sufficiently severe or pervasive as to create a hostile or abusive work environment and to thereby alter the terms or conditions of her employment. We, therefore, hold that the trial court erred in directing verdicts for Sibcy Cline on Bucher's sexual-harassment claims. Accordingly, we sustain the third assignment of error.

### III. Conclusion

Upon our determination that the trial court improvidently directed verdicts for Sibcy Cline on Bucher's discrimination and sexual-harassment claims, we reverse that portion of the judgment entered below and remand the case for further proceedings in accordance with law. In all other respects, the judgment of the trial court is affirmed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

Doan, P.J., Winkler and Shannon, JJ., concur.

Raymond E. Shannon, J., retired, of the First Appellate District, sitting by assignment.