NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0451n.06
Filed: May 27, 2005

No. 04-3666

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| LUE S. HARRIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO |
| GIANT EAGLE INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: GUY, DAUGHTREY, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Lue Harris, an African-American female, was

fired from her job in the video department of a Giant Eagle supermarket in Polaris, Ohio. She

brought a suit alleging race discrimination in violation of federal and state law. The district court

granted summary judgment to Giant Eagle. Harris appeals, arguing that: (1) white employees were

treated differently than she; and (2) statements by her supervisor regarding African-American

employees constituted evidence of race discrimination that entitled Harris to survive summary

judgment by invoking the "mixed-motive analysis" discussed in *Desert Palace, Inc. v. Costa*, 539

U.S. 90 (2003). For the reasons set forth below, we affirm the district court's decision granting

summary judgment to Giant Eagle.

**I.**

Lue Harris was hired by the Giant Eagle supermarket in Polaris, Ohio, as a pharmacy technician on September 11, 2000. After being hired, she went through an orientation and training program that lasted about a month. During the program, Harris watched videos concerning company policies and received training in various departments of the store, including the video department. She was also given an employee handbook, which, with her signature on the handbook, she acknowledged receiving and reading. The handbook included the store's video rental policy for employees. After working at Giant Eagle for a few months, Harris was asked by the store director to manage the store's video department while usual manager Kim Henry was on maternity leave. Before Henry went on maternity leave in February 2001, Harris met with Henry so Henry could explain what the video department manager's responsibilities were. At the same time, Harris also received management training with regard to the video department.

Harris stated in her deposition that when she took over as manager in the video department, she implemented a "promotion," after conferring with store director Jim Dinning and another supervisor, by which Giant Eagle video department employees had the opportunity to take home two videos per week at no charge. Henry indicated, however, that a similar policy had already been in place. Employees also could take home newly released videos the night before the video's actual release date. Henry testified that when an employee did this, the employee was supposed to write the item number on a receipt, which was placed in an envelope on the counter in the video department.

Harris and Henry indicated that the typical procedure was for employees to record the fact that they were checking out a video by scanning the bar code on the video and assigning it to the

employee's video rental card. Giant Eagle's employee handbook's video policy states that such employee rentals must be rung up at the video register by another employee, and that employees were subject to late charges, which should be paid immediately. The handbook also specifies that only the store manager or director has authority to delete employee late fees on video rentals. The handbook states that violation of the employee rental policy "will lead to disciplinary action up to and including termination. Taking or renting merchandise without payment in advance [or] unauthorized altering of late fees or rental charges...will result in termination."

Harris testified that employees often did not follow the procedures set out in the handbook. Specifically, she said that many employees took videos out without scanning them, and that, when employees brought back videos late, they simply post-dated the check-out time so as to avoid late fees. Harris stated that she had seen Henry do this and had "learned how to do it" from watching her. Another African-American video store employee, Nicole Carter, stated in a deposition that Henry often overrode late fees for white customers and employees but not for black ones.

Harris and Carter made other general observations about Henry's treatment of African-Americans, both before and after her maternity leave. Both stated that they had heard Henry make comments such as "you lazy black people," and "if it was up to me, none of you would be back here. But it's not up to me. But you won't make it. You'll all be fired." Harris said Henry made these statements three or four times. At one point, according to Carter and Harris, Henry put up a sign indicating the need to be "on the lookout for a black guy that looked like a crack head." Carter stated that, under Henry's management of the video department, the black employees had to do more and different chores than the white employees. Carter received an unsatisfactory evaluation when

Henry returned from maternity leave, so she met with Dinning, the store director, to complain about Henry's racial discrimination and other issues. Dinning evidently talked to Henry about these things and had Henry change Carter's evaluation score. Dinning told Carter a couple of days later that "he didn't feel that Kim would discriminate in any manner" and that the "store doesn't tolerate those type of things."

Henry stated in her deposition that when she returned from maternity leave in May 2001, she checked the rental account activity for all of the video department employees. She noticed that someone had used the video department batch number (an anonymous number) to delete late fees from the accounts of two employees, Jonathan Lamb and Jack Shepherd. Lamb is white and Shepherd is African-American. Henry verbally disciplined the two employees and contacted Bill Dobich in Giant Eagle's loss prevention department to report the incident. Dobich stated that there was not enough evidence to terminate either employee, because it was difficult to trace the use of the batch number to either employee. Henry later discovered that Lamb was deleting late fees (something that Carter had witnessed), and Lamb was terminated in the summer of 2002.

In July 2001, Henry and Dobich also found out that Harris was abusing her free video privileges by taking out between six to ten rentals per week, for at least several weeks. Dobich said that Harris should be written up for this infraction, but upon further research, Henry discovered that Harris had used her employee number to delete at least seven dollars in late fees from one of her video rental accounts. Henry reported this to Dobich, who said that there was reasonable cause for termination of Harris. Dobich asked Henry to ask Harris to come to a conference room in the store so that the three of them could meet. At this meeting (on July 19, 2001), Dobich confronted Harris

with documentary evidence of the deletion of late fees and the abuse of free video privileges, and Harris proceeded to get very upset and accuse Henry of lying. Harris denied removing late fees from her account. According to Dobich, however, Harris "offered no plausible explanations as to why she had done these things." Harris questioned the need for employees to pay late fees if they did not have to pay for the rentals in the first place.

In her account of the meeting, Harris said she told Dobich that she did not remember if she had erased any late fees from her account. Harris testified that Dobich "got all mad" during the meeting and called Harris a "smart ass." Harris said she had taken out two movies the previous week, in accordance with the practice of allowing employees two free rentals per week, but Dobich accused her of stealing the movies. Eventually, according to Harris, Dobich said, "I'll tell you what....I was going to suspend you, but now I'm firing your ass and I want you out this damn store [sic]. And if you don't get out of here, I'm going to have the damn cops come throw you out." The entire meeting lasted about ten or fifteen minutes. Harris then retrieved her things and left the store.

After the meeting, Dobich informed Dale Giovengo of the Giant Eagle's human resources department that he had removed Harris from the video department schedule "for violation of video policy and deletion of late fees." The violation of video policy was Harris renting and returning the videos to herself. In her complaint, Harris alleged that Lamb and Melanie Strohm, a white employee, committed this same violation of the video rental policy. Giovengo made the ultimate decision to terminate Harris. Dobich said he did not have the authority to terminate Harris, but the human resource department eventually forwarded him a copy of the letter by which Giant Eagle terminated Harris. At Giovengo's suggestion, Dobich had Ron Carpenter, an African-American

video department manager from another store, conduct an audit of all of the Polaris store's video

employees' computer transaction records. Carpenter said he did the audit in 2002, several months

after Harris had been fired. He concluded that the only employee who had deleted her own late

charges at the Polaris store was Harris. Giovengo's office also investigated and interviewed Strohm

and concluded that she had never deleted her own late fees, contrary to the allegation in Harris's

amended complaint.

After Harris was dismissed, she filed a complaint with the Equal Employment Opportunity

Commission. The EEOC issued a notice of right to sue on May 21, 2002. Harris filed suit against

Giant Eagle in state court on August 15, 2002, alleging race discrimination in violation of Ohio

Revised Code § 4112.02 and "wrongful discharge in violation of public policy of the state of Ohio

as set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq." Giant

Eagle removed the case to federal court on September 10, 2002. On March 27, 2003, Harris filed

an amended complaint, dropping the public policy claim and adding a federal race discrimination

claim based on 42 U.S.C. § 2000e-2(a)(1).[1] After the parties engaged in discovery, Giant Eagle

---

[1]Although neither party nor the district court raises the issue, it appears from the record that Harris's federal race discrimination claim is time-barred. Before filing a Title VII claim, a plaintiff must receive a right-to-sue letter from the EEOC and then file suit within ninety days after receiving the right-to-sue letter. 42 U.S.C. § 2000e-5(e) & (f)(1). Here, Harris's first assertion of her federal discrimination claim came over ten months after she received the right-to-sue letter. While her initial state court complaint refers to Title VII, it does so in the context of her wrongful discharge public policy state-law claim.

The ninety-day requirement of § 2000e-5(f)(1) is not jurisdictional. *See Seay v. TVA*, 339 F.3d 454, 469 (6th Cir. 2003). Even though a court may apply equitable tolling to the ninety-day deadline in very limited circumstances, *Brown v. Mead Corp.*, 646 F.2d 1163, 1165 (6th Cir. 1981), there is nothing to indicate that equitable tolling is appropriate here. Regardless, since neither party raised this issue, and we can dispose of this case relatively easily on the merits, we will assume

moved for summary judgment on December 15, 2003.  The district court granted the motion on

April 14, 2004.

**II.**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  The court must "view the evidence and draw all reasonable inferences therefrom in

the light most favorable to the non-moving party."  *Little v. BP Exploration & Oil Co.*, 265 F.3d

357, 361 (6th Cir. 2001).  If a reasonable jury could not return a verdict for the nonmoving party on

the basis of the evidence as construed in its favor, summary judgment should be granted to the

movant.  *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

**A.**

Harris alleges that she was fired as a result of unlawful bias against her based on her race in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Ohio Rev. Code

Ann. § 4112.02.  Under 42 U.S.C. § 2000e-2(a)(1), it is an "unlawful employment practice for an

employer...to discriminate against any individual..., because of such individual's race, color,

religion, sex, or national origin."[2]  "The ultimate question in every employment discrimination case

---

without deciding that Harris's federal claim was timely. *See Niecko v. Emro Mktg. Co.*, 973 F.2d
1296, 1299 (6th Cir. 1992) ("It is well settled law that this court will not consider an error or issue
which could have been raised below but was not.").

[2]Harris's state law employment discrimination claim under Ohio Rev. Code Ann. § 4112.02
is evaluated under the same framework and standards used to evaluate Harris's federal claim.  *See
Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994);

involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). A plaintiff may establish a prima facie case of employment discrimination with direct or indirect evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc); *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995). A "direct evidence" discrimination case requires proof "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Indirect or circumstantial evidence of discrimination, on the other hand, permits the inference that the employer acted with discriminatory animus. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Harris argues that Henry's racist statements constitute "*circumstantial* evidence of bias by a manager who was involved in the process leading to Harris' termination." When a plaintiff alleges indirect evidence of discrimination, this court evaluates the claim under the tripartite framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). Under the *McDonnell Douglas* framework, a plaintiff must first

---

*Bucher v. Sibcy Cline, Inc.*, 738 N.E.2d 435, 442 (Ohio Ct. App. 2000).

establish a prima facie case of discrimination or retaliation by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) despite her qualifications and employment, she suffered an adverse employment action; and (4) she was treated differently from similarly situated employees who were not within the protected class. *See id.* If the plaintiff meets this burden, the employer must establish a legitimate, non-discriminatory reason for the adverse employment action in issue. *Id.* Once the employer produces evidence of a non-discriminatory reason, the plaintiff has the burden to show that the proffered reason was pretext intended to obscure the true discriminatory motivations of the employer. *Id.*

The district court evaluated Harris's claim only under the *McDonnell Douglas* framework applicable to race discrimination claims based on indirect evidence. Under this framework, the fourth prong of the prima facie case analysis demands that

> the plaintiff...show that the "comparables" are similarly-situated *in all respects*. Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted). The district court found that Harris failed to present a prima facie case of race discrimination, because she could not show either that "a comparable non-protected person was treated better," or that "for the same or similar conduct [she] was treated differently than similarly situated non-minority employees." *Id.* at 582-83.

There does not seem to be any dispute over whether Harris was similarly situated to white video department employee Jonathan Lamb. On appeal, as she did in the district court, Harris argues that despite reports that Lamb deleted his own late fees, neither Henry nor any other manager took any action with respect to Lamb "up to the time of Harris's termination."[3] Harris, however, does not explain why the time of her termination is a legally significant event in this regard. After all, Harris admits that Lamb was later terminated for deleting his own late fees. As the district court noted, the termination of Lamb when evidence specifically linking him to deletion of late fees arose suggests that "when Giant Eagle could link the deletion of late fees to an employee's specific identification number..., Giant Eagle would terminate that individual," regardless of the employee's race. Also, when the late fees of both Lamb and Shepherd (an African-American employee) were previously deleted by an employee using an untraceable batch number, neither employee was terminated, because there was no evidence linking them to the action. In other words, even when the evidence is construed in her favor, Harris cannot show that, by being fired when it was discovered she had deleted her own late fees, she was treated any differently than similarly situated non-minority employees such as Lamb, who was also fired for the same reason. *See Strong v.*

---

[3]Also, as she did in the district court, Harris alleges that Carter saw another white employee by the name of Jonathan Stewart deleting late fees. But, as pointed out by the district court, there is no indication of anyone named "Jonathan Stewart" anywhere in the record, and certainly not in Carter's deposition testimony.

In her brief, Harris also refers to "Rob Saunders," who is mentioned in Carter's deposition. Carter testified that both Rob and his brother worked at Giant Eagle and that on one occasion one of them (it is unclear from the deposition transcript which one) demanded that Henry delete his late fees. Henry obliged. The record does not indicate whether this person was white or African-American, and the employee was also evidently not in the video department and thus not similarly situated to Harris.

*Orkand Corp.*, 83 Fed. Appx. 751, 753 (6th Cir. 2003) (affirming grant of summary judgment to defendant who took same adverse employment actions, for the same reasons, against both the plaintiff and a non-minority employee). The district court's analysis on this issue was not in error.

Assuming, *arguendo*, that Harris could establish a prima facie case of discrimination, Giant Eagle has articulated a legitimate non-discriminatory reason for its conduct (violations of its employee policies). Under the *McDonnell Douglas* framework, Harris thus must show that Giant Eagle's reason is pretextual.

> A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. Regardless of which option is used, the plaintiff retains the ultimate burden of producing *sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him*.

*Johnson*, 319 F.3d at 866 (internal quotation marks, alteration, and citations omitted) (emphasis added).

Drawing all reasonable inferences in Harris's favor, the evidence shows that: Henry made racist comments; Henry reported Harris's abuse of video policy and deletion of late fees to loss prevention employee Dobich; Dobich recommended firing Harris on the basis of the abuse of policy and deletion of late fees; and Harris was fired by Giovengo in Giant Eagle's human resources department. Under circuit precedent, when "an employee challenges his termination as improperly motivated by a supervisor's discriminatory animus and then seeks to impute that animus to the neutral decisionmaker who ultimately terminated the employee," the plaintiff "must offer evidence that the supervisor's racial animus was the cause of the termination or somehow influenced the

ultimate decisionmaker." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir. 2001); *see also Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 291 (4th Cir. 2004) ("[W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.").

Harris has produced no such evidence. The evidence reveals no connection whatsoever between Henry's alleged racist comments and the actions of Dobich, much less the decision made by Giovengo to terminate Harris. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[A] statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."); *see also Reeves*, 530 U.S. at 141 (holding that the impermissible consideration "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome") (internal quotation marks and citation omitted); *Price Waterhouse*, 490 U.S. 228, 241 (1989) (plurality opinion) (noting that the "critical inquiry" in a direct evidence case is whether the impermissible consideration "was a factor in the employment decision *at the moment it was made*"); *Das v. Ohio State Univ.*, 57 Fed. Appx. 675, 678-79 (6th Cir. 2003) ("Merely vague, ambiguous, or isolated remarks by a company agent which were not related to the decision-making process and were not made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of outlawed employment discrimination. . . .") (internal quotation marks and

alterations omitted); *cf. DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) ("[T]he fact that the comments were made by Bailey, DiCarlo's immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced DiCarlo's Italian-American heritage, and that the hate-speech occurred three weeks prior to DiCarlo's termination, all culminate in the conclusion that DiCarlo has presented sufficient [direct] evidence of causation to withstand summary judgment."); *Wexler*, 317 F.3d at 571-72 (finding a genuine issue of fact when an adverse employment decision was made by officers who made discriminatory references to the plaintiff's membership in a protected class); *Weberg v. Franks*, 229 F.3d 514, 520, 523-26 (6th Cir. 2000) (finding a genuine issue of material fact where decisionmaker both referred to the race of plaintiff in a disciplinary report demoting and suspending plaintiff and also reiterated the discriminatory sentiment in his deposition testimony); *Wells v. New Cherokee Corp.*, 58 F.3d 233, 237-38 (6th Cir. 1995) (finding no error in rejecting jury instruction based on *McDonald*, where the plaintiff's supervisor had made discriminatory comments but – unlike the supervisor in *McDonald* – was closely involved in the termination decision and had made discriminatory comments).

In other words, the fundamental problem in Harris's case is that she has introduced no evidence that tends to prove that the person who made racially discriminatory remarks had any role in her firing. Henry's remarks are relevant, but they do not by themselves create a genuine issue of material fact as to whether race was a motivating factor in Harris's dismissal. *Cf. Johnson*, 319 F.3d at 868 ("Although remarks made by an individual who has no authority over the challenged employment action are not indicative of discriminatory intent, the statements of managerial-level employees who have the ability to influence a personnel decision are relevant."). Clearly, Harris

- 13 -

has not produced "sufficient evidence from which the jury could...infer that the defendants intentionally discriminated against [her]." *Id.* at 866 (internal quotation marks and citation omitted).

**B.**

The foregoing analysis is important in disposing of Harris's primary argument on appeal: that statements by Henry regarding African-American employees constituted (either direct or circumstantial) evidence of race discrimination that entitled Harris to invoke "mixed-motive analysis." Harris points out that the district court did not consider this argument, even though it was raised in her brief opposing Giant Eagle's motion for summary judgment.[4]

The mixed-motive analysis derives from *Price Waterhouse v. Hopkins*, where the plaintiff alleged that both legitimate and illegitimate (discriminatory) reasons - in other words, "mixed motives" - motivated the adverse employment decision.

> The [*Price-Waterhouse*] Court held that, in cases where the plaintiff offers "direct evidence" of unlawful discrimination and the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was *a substantial motivating factor* in that decision. If the finder of fact concludes that the plaintiff has carried this burden, the burden of persuasion shifts to the defendant to prove that the unlawful motive was not a but-for

---

[4]Giant Eagle takes issue with Harris's raising of this argument on appeal, noting that Harris "only pled a single motive case [in her complaint], not a mixed-motive case that would require an analysis under *Desert Palace*." Harris is not foreclosed from arguing mixed-motive analysis simply because she did not refer to it in her complaint. *See Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1110 n.8 (9th Cir. 1991) ("A plaintiff need not choose between a single motive and mixed motive theory at the beginning of the case."); *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 n.7 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003) ("[A] case need not be characterized or labeled [as single or mixed motive] at the outset. Rather, the shape will often emerge after discovery or even at trial. Similarly, the complaint itself need not contain more than the allegation that the adverse employment action was taken because of a protected characteristic.") (citing *Price Waterhouse*, 490 U.S. at 247 n.12 (plurality opinion)).

cause, i.e., that the same action would have been taken, because of legitimate considerations, in the absence of the unlawful motive.

*Miller v. Cigna Corp.*, 47 F.3d 586, 594 (3d Cir. 1995) (en banc) (emphasis added). Partly in response to *Price Waterhouse*, Congress passed the Civil Rights Act of 1991, which amended Title VII. Under the 1991 Act, "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). When a plaintiff proves a violation using this "mixed-motive" approach, an employer has a limited affirmative defense (restricting the remedies available to the plaintiff) if it can prove that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B). In the wake of this legislation and the *Price Waterhouse* opinion, most courts (including this one) held that to invoke the mixed-motive analysis, a plaintiff must produce direct evidence that the employer considered impermissible factors when it made the adverse decision at issue. *See, e.g., Wexler*, 317 F.3d at 571. However, in *Desert Palace,* 539 U.S. at 92, the Supreme Court clarified that direct evidence is not required to establish liability under § 2000e-2(m); rather, a plaintiff can obtain a "mixed-motive" jury instruction based only on circumstantial evidence.

This circuit has not yet addressed the question of whether the *McDonnell Douglas* burden-shifting framework should be modified in the wake of *Desert Palace*. However, an extended discussion of mixed-motive analysis and the Supreme Court's decision in *Desert Palace* is unnecessary for present purposes. While some courts have disagreed over the effect of *Desert*

*Palace* on *McDonnell Douglas*, they nonetheless agree that at the summary judgment phase, the crucial question is "whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that [a protected characteristic] was *a motivating factor* in [the defendant's adverse employment action against the plaintiff]." *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa*, 285 F. Supp. 2d 1180, 1196 (N.D. Iowa 2003) (emphasis added) (internal quotation marks and citation omitted); *see Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 866 (M.D.N.C. 2003). In other words, the focus remains on "whether the plaintiff can meet his or her 'ultimate burden' to prove intentional discrimination." *Dunbar*, 285 F. Supp. 2d at 1197; *see Reeves*, 530 U.S. at 153. When bringing a mixed-motive claim, a plaintiff must, at a minimum, meet her burden of showing that race was a motivating factor in the termination decision. *See Dunbar*, 285 F. Supp. 2d at 1196.

As described *supra*, Harris has not set forth sufficient "evidence, direct or circumstantial, from which a reasonable jury could logically infer" that race was "a motivating factor" in Giant Eagle's decision to terminate her. *See id.* (internal quotation marks and citation omitted). Therefore, even though the district court did not consider Harris's "mixed-motive" claim, it has no merit.

**III.**

For the foregoing reasons, we affirm the district court's decision granting summary judgment to Giant Eagle.